**BOSTON EDUCATIONAL RESEARCH COMPANY, INC., Plaintiff, Appellant,**

v.

**AMERICAN MACHINE & FOUNDRY COMPANY, Defendant, Appellee.**

**No. 73–1112.**

United States Court of Appeals, First Circuit.

Argued Oct. 1, 1973.

Decided Dec. 12, 1973.

---

Stephen S. Young, Boston, Mass., with whom Sherburne, Powers & Needham, Boston, Mass., was on brief, for appellant.

George W. McLaughlin, Boston, Mass., for appellee.

Before McENTEE, MOORE * and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant Boston Educational Research Company, Inc. (Boston) appeals from a judgment of the district court denying relief upon its claims that American Machine & Foundry Company (American) wrongfully disposed of its goods. The opinion of the district court, which we affirm, appears at 355 F.Supp. 1272 (D.Mass.1973).

The goods in question, primarily cartons of teaching devices known as "Dial-a-Word Calculator Wheels", were left on premises in Connecticut by Boston's now-defunct corporate subsidiary, hereinafter styled "Sales". American, which owned the premises, had let them during 1970 and until May, 1971, to a firm which we shall refer to as "Future

* Of the Second Circuit sitting by designation.

Foods". Future Foods, with American's consent, had in turn sublet space to Sales and other subtenants.

Sales received the cartons from its parent, Boston, in June of 1970, and stored them on the mezzanine. They numbered between 100 and 150, occupying a floor space of 20 by 10 feet, rising six feet in height, and weighing close to nine tons. Boston's name was stencilled on some. Fear that they might damage the floor led Future Food's president to complain to Sales' president about their presence, but nothing was done about them and at the end of September, 1970, Sales quit the premises and went out of business shortly thereafter. When Sales vacated, it left behind a considerable quantity of material: the cartons, some of which became broken so that their contents lay on the floor, a sound-proof room, tape recorders, and other property. Sales' president, who was also a director of its parent company, Boston, returned to the premises on occasion but neither tidied up nor removed the cartons. Sales terminated its sub-lease and settled its rent with Future Foods through October 1, 1971, apparently by giving the latter some merchandise. It discussed either selling the Dial-a-Words or letting Future Foods sell them, but efforts in that direction were fruitless.

On January 30, 1971, the president of Future Foods wrote to Boston's president complaining of "the continuing use of our building by you for storage purposes." He wrote,

"There is no way to catalog your occupied space except to say that it is the residue left when your subsidiary Sales . . . ceased operations here on October 1, 1970.

"Our files contain correspondence about this storage condition without any response or attempt to correct this condition on your part.

". . . [W]e cannot permit this situation to continue.

"Accordingly, we are enclosing our invoice . . . covering a token charge [$392] for storage for the period October 1, 1970, thru January 31, 1971.

\* \* \* \* \* \*

"Please be advised that should we not receive payment of this amount by February 12, 1971, along with advice about your plans for your material, we will dispose of it all in the quickest possible fashion."

Boston did not reply by February 12, but on February 17 its president wrote to Future Foods, enclosing no money but relaying the assurance that Boston had "plans" for the material and requesting Future Foods to "continue [its] cooperation" for another thirty days "at which time our plans call for the [sic] removing these materials and paying your storage charges."

There was testimony that Future Foods never received the letter, but in any event it never responded and there was no further correspondence. During the winter and spring Boston did not remove the materials nor did it pay the storage charge.[1]

Shortly before Future Foods had written to Boston in January, American notified Future Foods to quit the premises. Future made plans to do so, and notified its subtenants, but not the defunct Sales, to quit. All did so, and the building was returned to American during May of 1971. American, for its part, had sold the building to another firm, and had undertaken to deliver the premises on June 2, 1971, broom-clean and free of all tenants. An inspection of the premises during the latter part of May revealed the property Sales had left behind. Material of obvious value, such as the sound-proof room and tape recorders, was removed from the premises and stored. The cartons on the mezzanine were discovered in somewhat dilapidated condition; some had been broken and the contents scattered about. Employees

---

1. The president of Boston testified that he tried several times during March or April to call the president of Future Foods but could not reach him.

opened a few of the cartons and decided that the contents were valueless; American made no attempt to contact Sales or Boston. Pursuant to orders of the assistant manager of American's real estate department, the cartons and contents were then thrown away. Boston regained its interest in the Dial-a-Words sometime during July of 1971 and dispatched an employee to discover what had happened to them; he discovered that they were gone and this suit followed.

Boston puts forward three alternative theories of recovery under Connecticut law.[2]

■ The first is that American was negligent as a matter of law because it did not advertise the goods and otherwise comply with 50 Conn.Gen.Stat. § 50–2.[3] Under Connecticut law the breach of a statute may support a finding of negligence. *Compare* Buravski v. DiMeola, 141 Conn. 726, 109 A.2d 867 (1954), *with* Gonchar v. Kelson, 114 Conn. 262, 158 A. 545 (1932). *See* Restatement of Torts (Second) § 286 (1965).

■ We need not address American's argument that Boston is outside the range of interests protected by the statute.[4] Even if American is deemed "negligent" for not following the statutory procedure, Boston cannot recover unless American's negligence was the proximate cause of Boston's loss. Boston had no Connecticut office. How an advertisement in a Greenwich, Connecticut, newspaper would have added anything to the actual notice received from Future Foods has not been shown. The district court held that the failure to advertise was a mere "condition" and not the proximate cause of the loss, because "[i]t is difficult to imagine how [Boston] would have benefited had defendant complied with the statute and advertised." 355 F.Supp. at 1276. Having taken no steps to remove the goods or pay storage, and having reneged on its own February 17 assurances of removal and payment, Boston is not in a position to assert harm because of noncompliance with the statute.

■ Boston's second contention is that American's employees, by disposing of the cartons without attempting to communicate with Boston or Sales, failed to exhibit the care of reasonably prudent men. Boston points to the district court's statement that "plaintiff's negligence theory fails because of its own lack of due care . . . ." Implicit in that statement, says Boston, is a finding that American was itself negligent. We disagree. While the court did not specifically find that American's employees acted in the exercise of due care, it nowhere found they did not. It was plainly implied in the court's opinion that, under circumstances then appearing, including the dilapidated condition of the boxes and the apparent worthlessness of their contents, American behaved not unreasonably.

2. The action is brought under the diversity jurisdiction and the parties concede that the law of Connecticut is controlling.

3. "All goods not perishable, left with any person or upon any public wharf or highway . . . and whose owner is unknown or neglects to take them away for six months from the time when they were left, shall be advertised one month in a newspaper published in the county where such goods were left. If the owner thereof does not take them away within such month, they may be sold and the proceeds disposed of in the manner provided in section 50–1." [Section 50–1 provides that the proceeds shall be paid over to the town treasurer.]

4. American argues that the statute was intended to protect finders and bailees rather than losers and bailors. There is no legislative history, but the object of this and similar state statutes may have been to relieve finders from near-absolute liability for conversion by providing for the legal disposal of unwanted and unclaimed property. *See* Restatement of Torts (Second) § 226A, Comment b. But the scope of the statute's protection may also extend to the losers and bailors who were to receive the notice, and so disregard of its provisions is not necessarily without adverse consequences for a finder.

■ American, moreover, is not to be deprived of the benefit of such defense to a claim of negligence or conversion as might have been raised by its predecessor in possession, Future Foods, had it been the latter that destroyed the goods.

Future Foods acted patiently and reasonably in its efforts to induce first Sales, and then Boston, to remove the goods. It notified Boston of its intention to dispose of them. The court found that Boston's inaction "warrants the conclusion that plaintiff had lost interest in this stack of cartons." Had Future Foods itself before surrendering the leasehold disposed of the cartons, it would, on the court's findings, have been acting with due care. When American took possession of the premises and the unwanted goods, it was not constrained to start afresh; it took the goods subject to the same privilege to dispose of them.

■ The most forceful of Boston's claims is that American converted its goods.

"Conversion is usually defined to be an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's right . . . . The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right to dominion, and to his harm." Gilbert v. Walker, 64 Conn. 390, 394–395, 30 A. 132, 134 (1894).

Underprivileged destruction of goods is a classic case of conversion, W. Prosser, Torts 91 (4th ed. 1971).

■ Privileges to convert have been rare in American law, since the tort is an outgrowth of trover, in which the only allegations were that plaintiff had lost his goods, that defendant had found them, and that they had not been returned. The mere fact of loss was enough to recover. See J. Fleming, The Law of Torts 52–56, 78–79 (3d ed. 1965). See also Restatement of Torts (Second) §§ 229, 235 (1965). Liability will lie for conversion even though the property was carelessly lost by its real owner, even though the defendant mistakenly appropriated the property, and even though the defendant received no benefit from his deed. Stoddard v. Couch, 23 Conn. 238 (1854). So much is clear. However, although there are no Connecticut cases on point, other courts have held that among the available defenses are an apparent abandonment of the goods combined with their apparent lack of value, at least when the alleged converter is acting in good faith. The reason for such an exception was simply put by the Supreme Judicial Court of Massachusetts in Row v. Home Savings Bank, 306 Mass. 522, 526, 29 N.E.2d 552, 554 (1940):

"[The property's] apparent worthlessness excused the defendant from searching for the owner. Moving the property into the street would have made the defendant liable for a public nuisance. . . . No storage warehouse could be expected to receive worthless property depending for payment upon a lien. The defendant could not be expected to contract for storage that probably would continue indefinitely."

In *Row* plaintiff had space in a building owned by the Campfire Girls who had moved out of the building. Plaintiff knew that the building was to be vacated, and she had removed most of her own belongings except for two trunks and a suitcase. Although items of obvious value were stored in the trunks, they left an overall impression that might also be conveyed by trunks full of old and worthless papers and baubles. Two months went by after plaintiff received notice that the Campfire Girls were leaving the building and that everything was "going out"; she did nothing. The mortgagee foreclosed, took possession, and threw away the "debris". The situation is similar to ours: plaintiff had notice that the property was in danger, but took no action; defendant threw away what might reasonably appear to be valueless without making any attempt to

contact the owner, even though such an attempt probably would have been successful. And American went even further than did the mortgagee in *Row*, since American detected and stored some items that did appear to have value. Cf. Vissenberg v. Bresnahen, 65 Wyo. 367, 202 P.2d 663 (1949). As the district court found, a possessor faced with material left behind cannot act unreasonably, but is "entitled to act on appearances". 355 F.Supp. at 1278. It did so here, and the court correctly found that it had not converted the Dial-a-Words.

Affirmed.