JOHN L. T. WAUGH, Plaintiff-Appellant, *v.* THE UNIVERSITY OF HAWAII, a body corporate, the BOARD OF REGENTS OF THE UNIVERSITY OF HAWAII, and RICHARD G. INSKEEP, Defendants-Appellees

NO. 6098

DECEMBER 31, 1980

RICHARDSON, C.J., OGATA AND MENOR, JJ.*

---

* Justices Kobayashi and Kidwell, who heard oral argument in this case, retired from the court on December 29, 1978, and February 28, 1979, respectively. HRS § 602-10 (1979 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

118

120

OPINION OF THE COURT BY RICHARDSON, C.J.

This is an appeal by plaintiff John L. T. Waugh from an order by the trial court granting defendants' motion to dismiss at the close of plaintiff's case. The trial court held that the claims against defendant University of Hawaii and defendant Board of Regents were barred by the statute of limitations. The claim against defendant Richard G. Inskeep was dismissed on the merits. We affirm.

## FACTS

Plaintiff-appellant, Dr. John L. T. Waugh, a specialist in inorganic and physical chemistry, joined the University of Hawaii's Department of Chemistry faculty in 1956. Dr. Waugh was assigned an office with a private connecting laboratory in Bilger Hall on the University's Manoa campus.

On June 9, 1969, Dr. Richard Inskeep, then Chairman of the Chemistry Department, issued a memorandum directing faculty members who were preparing for sabbatical leave, including Dr. Waugh, to clear their respective offices for temporary use by the Department during their absences. As he had done before leaving on a previous sabbatical, Dr. Waugh cleared his desk and certain storage and laboratory bench space. In his laboratory, Waugh left an assortment of personal equipment, as well as a variety of scientific apparatus and laboratory equipment provided by the University for his use as a faculty member. Dr. Waugh also left behind various containers, including covered beakers, vials, vacuum dessicators, and a large hexagonal vacuum rack of his own design. Some of these vessels contained rare chemical compounds of complex structure which Waugh had synthesized throughout his career.

The day before leaving on his sabbatical, Dr. Waugh returned to his University office to check his mail and clear up any remaining details. In doing so, he discovered that a few personal items and some laboratory equipment had been removed from his office and were being used by other members of the Department. Waugh located the equipment and demanded its return. He also filed a written complaint with Richard Takasaki, Acting President of the University, reporting the incident and asking that his office and laboratory not be further disturbed during his absence. Copies of the complaint were sent to Chairman Inskeep and other Chemistry Department faculty.

Professor George Andermann, whose office adjoined Dr. Waugh's, volunteered to store whatever items Waugh wanted to leave in his safekeeping. Waugh availed himself of Andermann's offer and transferred a four-drawer filing cabinet, its contents, and several small pieces of laboratory equipment to Andermann's office. Waugh left on sabbatical on June 18, 1969.

While Waugh was on sabbatical, his office was occupied by a visiting professor for a brief period of time. Dr. Inskeep then assigned the office and laboratory space to another member of the Chemistry Department, Dr. Carl Seff, for his permanent use. Inskeep did not advise Waugh of this change but in a letter dated July 14, 1969, Seff informed Waugh of the reassignment.

Dr. Inskeep instructed Dorothy Matsuo, the supervisor of the Chemistry Department stockroom, to clear out Waugh's laboratory space for use by Dr. Seff. Matsuo was told to set aside items that appeared to be Waugh's personal property and to keep such items in the storeroom for safekeeping. Evidently to provide Dr. Seff with additional space, Inskeep thereafter instructed Matsuo to have the hexagonal vacuum rack of Waugh's own design removed from the laboratory; accordingly, the rack was dismantled.

In August of 1970, Dr. Inskeep, in apparent response to the complaint filed before Waugh's departure, appointed an *ad hoc* committee to determine what items of personal property and University equipment were stored in Waugh's office prior to his sabbatical. The committee was directed to recommend what University equipment should be assigned to Waugh and to attempt to recover any missing personal property. Inskeep indicated that the committee's recommendation, if accepted or modified by the Chemistry

Department faculty, would be considered binding, within budgetary restrictions, on the Department Chairman.

Upon his return from sabbatical in September of 1970, Waugh discovered that some of the items that he had left in his laboratory, most notably the rare chemical compounds which he had synthesized and the hexagonal vacuum bench of his own design, were no longer in his old office. The hexagonal rack had been dismantled and its frame stored in a freshman laboratory. In December of 1970, Waugh received four boxes from storage containing the materials cleared out of his laboratory. His rare chemical compounds were not found in the boxes nor could these materials be located after diligent search by Waugh, stockroom personnel, and the *ad hoc* committee appointed by Inskeep.

By memorandum dated May 11, 1971, the Chemistry Department *ad hoc* committee informed Waugh that its members had determined, after consultation with University officials, that the committee's jurisdiction did not cover restitution of Waugh's personal items and that, henceforth, the committee's attention would be restricted to the possible restitution of Departmental supplies, equipment, and any compounds synthesized since Waugh joined the University faculty. Waugh was advised to contact Victor Bloede, the University of Hawaii Contracts Officer, on his "less expensive personal items" and to consult David Contois, Dean of the College of Arts and Sciences, as to the procedures for "restitution of highly expensive personal items, such as any missing research compounds that you brought to the University of Hawaii."

Waugh contacted Bloede and Contois in May of 1971. Bloede responded to Waugh's inquiries on or about May 19, 1971. He noted that the State Tort Liability Act, HRS § 662-3, permitted recovery for loss or damage to property directly resulting from the negligent or wrongful act or omission of an employee of the University while acting within the scope of his office or employment. Bloede further noted that the Attorney General could arbitrate and settle claims amounting to $2,000 or less without the necessity of suit being filed; such claims, Bloede informed Waugh, could be processed through Bloede's office.

On June 1, 1971, Dean Contois replied to Waugh's inquiry. He stated that as to loss of personal property, he would investigate and report to the University Administration after the *ad hoc* committee

had made its recommendation. The *ad hoc* committee's report, his own investigation and any other information, along with any formal claim for reimbursement, Contois stated, would be forwarded to the Attorney General's office for final disposition.

. On July 1, 1971, the *ad hoc* committee reported to the Chairman and the Executive Committee of the Chemistry Department that after various searches, it had failed to recover plaintiff's missing research materials although a few departmental supply items had been found. In August, plaintiff gave the *ad hoc* committee a further description of some of the rare compounds which had been lost.

The *ad hoc* committee's report was completed in November 1971. The committee made four recommendations with regard to restitution for the loss of research materials constructed or synthesized by Waugh while employed at the University and for loss of materials purchased by University funds. They recommended that Professor Waugh be given use of his former office and laboratory or equivalent space; that he be allowed to purchase supplies and equipment of value equivalent to the items that had been lost; that he be provided with the aid of the Departmental Glass Shop on a high priority basis to construct a vacuum rack; and that he be provided with the support of a postdoctoral associate researcher, a graduate student, and an undergraduate assistant for specified periods of work time, and be given special consideration in obtaining other departmental resources, in order to help restore his research to its original level. The report was adopted by the Chemistry Department faculty and forwarded to Dean Contois on December 17, 1971.

After the *ad hoc* committee's report was referred to Dean Contois, Waugh requested a reply. Contois responded on February 25, 1972. While agreeing with the *ad hoc* committee's recommendations, he also stated that restoration or return of plaintiff's personal property would have to be pursued through the Attorney General's office. Contois referred plaintiff's complaints against Dr. Innskeep to Richard Takasaki, Chancellor of the Manoa Campus, who then referred the matter to the Faculty Senate Committee on Privilege and Tenure. On May 2, 1972, that Committee recommended full restitution to Professor Waugh and the assignment of additional assistants to aid in the reconstruction of his research.

In September of 1972, Waugh wrote to Takasaki, who had assumed the office of executive vice-president at the University,

advising him that because of the University Administration's failure to act, he felt that it might be necessary to resort to civil litigation. However, he asked Takasaki to consider every conceivable possibility in resolving the matter within the University. Takasaki replied on September 29, 1972 that the University had done all it could administratively and was without legal authority to settle claims for personal injury or property damage. Any further action in regard to the matter, he advised, must necessarily go beyond University administrative channels.

On March 28, 1973, plaintiff brought suit against the University of Hawaii, the Board of Regents, and Dr. Richard Inskeep, in his individual capacity. In count I of his suit, he requested restitution or, in the alternative, that the University be required to promulgate rules of practice pursuant to the Hawaii Administrative Procedure Act (HRS Chapter 91), and that he be allowed to pursue his claim under these new regulations. In count II, he asked for damages from Inskeep on a bailment and tort theory. A motion to dismiss both counts was made and as noted earlier, the trial court dismissed the claim against the University and the Board of Regents, holding that the suit was in the nature of a tort action and barred by the statute of limitations. The claim against Inskeep was dismissed on the basis that no enforceable contract of bailment existed and that even if such a contract had existed, plaintiff failed to establish by a preponderance of the evidence that Inskeep was negligent.

I.

Appellant raises several issues with regard to the dismissal of his claim against the University and Board of Regents. He first argues that because he requested restitution, his action was equitable in nature and the tort statute of limitations should not have been applied. He then contends that even if the statute of limitations did apply, the trial court erred in finding that the cause of action accrued in late August of 1970. Appellant also raises an estoppel defense to the statute of limitations, claiming that the University lulled him into believing that restitution would be made. Alternatively, appellant argues that the statute of limitations was not applicable to count I of his suit since he also requested that the University be required to establish rules of practice and procedure for the handling of claims

such as those presented by him. We discuss each of these issues below.

A. *Applicable Statute of Limitations.*

Appellant's first contention is that the trial court erred in holding that count I of his complaint sounded in tort and was barred by the applicable statute of limitations. Appellant sought a mandatory injunction ordering the University and Board of Regents to make restitution of his property in accordance with the recommendations of the *ad hoc* committee and the Faculty Senate Committee on Privilege and Tenure. He argues that since the relief he requested was equitable in nature, the tort statute of limitations should not have been applied.

This court has recognized that the doctrine of sovereign immunity precludes a suit against the state without the state's express consent. *Big Island Small Ranchers Ass'n v. State*, 60 Haw. 228, 236, 588 P.2d 430, 436 (1978); *Helela v. State*, 49 Haw. 365, 369, 418 P.2d 482, 485 (1966). The University of Hawaii is subject to suit only in the manner provided for suits against the state. HRS § 304-6.[1] The state has waived immunity to suit to the extent specified in chapters 661 and 662 of Hawaii Revised Statutes. Chapter 662, the State Tort Liability Act, contains a provision giving the circuit courts jurisdiction to hear tort claims against the state. HRS § 662-3.[2] Actions

---

[1] HRS § 304-6 provides:

Suits. The university may sue and be sued in its corporate name; however, it shall be subject to suit only in the manner provided for suits against the State, and any liability incurred by the university in such a suit shall be the liability of the State. For the purposes of this provision, members of the board of regents are "employees of the State" as the term is used in chapter 662.

[2] HRS § 662-3 provides:

Jurisdiction. The circuit courts of the State shall have exclusive jurisdiction of all tort actions on claims against the State, for money damages, accruing on and after July 1, 1957 for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the State while acting within the scope of his office or employment.

(Amended in 1978 to provide district courts as well as circuit courts with jurisdiction of all tort actions. Act 158, 1978 Session Laws.)

brought under this provision are governed by a two-year statute of limitations. HRS § 662-4.[3]

Section 1 of Chapter 661 provides the circuit courts with jurisdiction to hear:[4]

(1) All claims against the State founded upon any statute of the State; or upon any regulation of an executive department; or upon any contract, expressed or implied, with the State, and all claims which may be referred to any such court by the legislature; *provided, that no action shall be maintained, nor shall any process issue against the State,* based on any contract or any act of any state officer which the officer is not authorized to make or do by the laws of the State, nor *upon any other cause of action than as herein set forth.* (Emphasis added.)

A two-year limitations period also applies to suits brought pursuant to this statute. HRS § 661-5.[5]

Since the only suits to which the state has consented are defined by the above two chapters, appellant's action must have been brought under one of these two chapters or else be barred by the doctrine of sovereign immunity. Actions brought under *either* provision are governed by two-year limitation periods. Thus, we do not decide whether appellant's claim sounded in tort or was based on some other theory because in any event it would be barred if brought more than two years after the cause accrued.

B. *Date on Which Cause of Action Accrued.*

Appellant's second major contention is that the trial court erred in finding that his cause of action accrued in late August of 1970.

---

[3] HRS § 662-4 provides:
Statute of limitations. A tort claim against the State shall be forever barred unless action is begun within two years after the claim accrues, except in the case of a medical tort claim when the limitation of action provisions set forth in section 657-7.3 shall apply.

[4] Amended in 1978 to provide district courts with identical jurisdiction. Act 156, 1978 Sess. Laws. Subsequently amended in 1979, Act 152, 1979 Sess. Laws.

[5] HRS § 661-5 provides:
Limitations on action. Every claim against the State, cognizable under this chapter, shall be forever barred unless the action is commenced within two years after the claim first accrues; provided, that the claims of persons under legal disability shall not be barred if the action is commenced within one year after the disability has ceased.

Evidently, the trial court was under the mistaken impression that Waugh returned from his sabbatical in late August of 1970 and at that time discovered that various items of personal property were missing from his office. It is clear from his testimony at trial that Professor Waugh did not return from sabbatical until September 6, 1970. However, this erroneous finding by the trial court[6] does not make a substantial difference with regard to the date on which plaintiff's cause of action accrued.

In several instances, this court has had occasion to construe the meaning of the word "accrued" as used in a statute of limitations. In *Yoshizaki v. Hilo Hospital,* 50 Haw. 150, 154, 433 P.2d 220, 223 (1967), we held that a limitation period of two years on actions for damages to persons or property did not begin to run "until the plaintiff knew or should have known of the defendant's negligence." In *Basque v. Yuk Lin Liau,* 50 Haw. 397, 441 P.2d 636 (1968), a tort action for property damage, we reversed a trial court judgment barring the action because of a two-year limitation period, and remanded for a determination of whether "the plaintiff knew or in the exercise of reasonable care should have discovered that an actionable wrong has been committed against his property." 50 Haw. at 399, 441 P.2d at 637-38.

We have closely examined the facts of this case and conclude that plaintiff had sufficient knowledge of the loss or damage to his personal property at the very earliest in September of 1970 and at the very latest in December of 1970. Plaintiff returned from sabbatical on September 6, 1970. At that time, he became aware that his laboratory had been completely cleaned out, that some of his equipment was in storage, and that the vacuum rack of his own design had been dismantled. Appellant testified that the vacuum rack was constructed primarily from materials that he had supplied. Further, he stated that a sample of pure boron as well as samples of boron iodides had been under vacuum in the hexagonal rack and had been destroyed upon the rack's dismantling. Thus, upon returning from sabbatical, appellant knew that his vacuum rack and

---

[6] A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Kim v. State, 62 Haw. 483, 616 P.2d 1376 (1980).

some of his research materials had been destroyed. We believe that at this point appellant knew, or reasonably should have known, that an actionable wrong had been committed against his property.

As far as his other research materials were concerned, appellant had a right to those items upon his return to the University and thus he may have been able to bring a tort claim against the University in September of 1970. However, it was not unreasonable for appellant to believe, or at least hope, that these materials would be found in the boxes stored by the stockroom personnel. In December of 1970, appellant received four boxes from storage containing the remains of his laboratory. Appellant testified that the boxes contained "broken pieces of glass, stuff that is common enough and not of any great value to anyone else." Appellant's missing research compounds were not among the items in storage. At this point, it is clear that appellant knew or should have known that his property was either damaged or missing and could have filed an action against defendants.

Appellant has argued that he did not actually know that his research materials were irretrievably lost until a later date. He suggests various other dates on which the cause of action could have accrued, including May 19, 1971 when Contracts Officer Bloede made appellant aware of the State Tort Liability Act and July 1, 1971 when the *ad hoc* committee reported that it could not find appellant's missing research materials. It has never been the rule in this jurisdiction that the defendant or an agent of defendant must inform the plaintiff of the right to bring suit. Thus, the date on which Bloede informed appellant of the State Tort Liability Act is irrelevant for purposes of the statute of limitations. Further, although appellant did not know with certainty that his research materials would not be discovered, Waugh did know upon his return to the University that some of his materials had been destroyed and others were missing. This knowledge was sufficient in itself to form the basis for an action against the University, and the *ad hoc* committee's conclusion could only serve to buttress appellant's knowledge.

## C. *Equitable Estoppel.*

Appellant next argues that the University either waived its right to assert the statute of limitations or is estopped from doing so because it required him to engage in internal administrative pro-

ceedings and lulled him into believing that restitution would be made.[7] We do not agree.

Appellant was not required to follow University administrative procedures. As appellant readily admits, there were no established internal procedures for handling claims such as his. Chairman Inskeep had set up an *ad hoc* committee to consider Waugh's claim, but as the name of the committee implies, it was established to deal with a particular problem and was not a standing committee. The record indicates that Inskeep informed that committee that its recommendations would be voted upon by the chemistry department faculty and, as modified, would be considered binding, *within the limitations of the Department's budget.* However, neither the *ad hoc* committee nor the Department Chairman had the power to bind the University and Board of Regents. At trial, appellant himself admitted that no one in the University administration assured him that the *ad hoc* committee's recommendations would be followed.[8] Further, as early as May of 1971, appellant was informed by Contracts Officer Bloede that chapter 662 of the Hawaii Revised Statutes covered tort claims for damage to or loss of personal items, although claims for losses totaling $2,000 or less could be arbitrated by the Attorney General's office without resort to suit.

In *Doherty v. The Hartford Insurance Group,* 58 Haw. 570, 574 P.2d 132 (1978), we set forth the elements of equitable estoppel. We stated that "[o]ne invoking equitable estoppel must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped, *and* that such reliance was reason-

---

[7] For its part, the University contends that the doctrine of equitable estoppel does not apply against the state. We need not discuss that contention here, but note that in Filipo v. Chang, 62 Haw. 626, 618 P.2d 295 (1980), we held that the doctrine of equitable estoppel could be applied against the government in order to prevent manifest injustice.

[8] At trial, appellant stated the following on cross-examination:

Q. (By Mr. Wood, defendants' attorney) Did anyone at the University in the Administration, Chairman Inskeep, his successor, or others above him, assure you that the University of Hawaii would honor any recommendation of the ad hoc committee?
A. Did they assure me?
Q. Yes.
A. No, not that I know of.

able." 58 Haw. at 573, 574 P.2d at 134-35. *See generally* Annotation, *Estoppel — Statute of Limitations*, 44 A.L.R.3d 482 (1972) and cases cited therein. Recently, in *Filipo v. Chang*, 62 Haw. 626, 618 P.2d 295 (1980), we held that, under the facts of that case, the usual reliance element of equitable estoppel could be dispensed with in order to prevent manifest injustice. We find no reason to apply the *Filipo* rationale to this factual situation.

In this case, while appellant quite reasonably hoped that in cooperating with the *ad hoc* committee he would either locate his lost research materials or in some other way have his research restored, there is no indication in the record that he was promised restitution or that he was asked not to bring suit. Also of significance is the fact that at the end of September in 1972 appellant was informed by Richard Takasaki, Vice President of the University, that any further action on his claim "must necessarily go beyond University administrative channels and requires at your discretion the filing of a claim or a request for legislative relief or *the initiation of civil litigation.*" (Emphasis added.) Appellant did not file suit until March of 1973, six months *after* Takasaki's letter. We think it is apparent from the facts of this case that appellant was not relying on any representation by the University in delaying the filing of suit. Thus, we do not believe that the doctrine of equitable estoppel is applicable to this case.

D. *Hawaii Administrative Procedure Act.*

Appellant's final contention is that the statute of limitations was not applicable to count I of his suit because, as an alternative remedy, he requested that the University be required to establish, pursuant to the Hawaii Administrative Procedure Act, HRS chapter 91, (hereinafter HAPA), certain rules of practice to handle claims such as his, and then to process his complaint in accordance with those rules. Since, for the reasons expressed below, we believe there is no merit to plaintiff's substantive argument, we do not decide whether the statute of limitations would have barred appellant's action in spite of his requested alternative remedy.

HRS § 91-1(4) defines a rule as an:

[A]gency statement of general or particular applicability and

future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public. . . .

In commenting on the HAPA definition of "rule", Standing Committee Report No. 8, 1961 Hawaii House Journal 656, stated:

It is intended by this definition of "rule" that regulations and policy prescribed and used by an agency principally directed to its staff and its operations are excluded from the definition. In this connection your Committee considers matters relating to the operation and management of state . . . educational . . . institutions . . . primarily a matter of "internal management" as used in this definition.

Assuming, without deciding, that HAPA is applicable to the University of Hawaii,[9] we believe that the "rules" of practice which appellant claims the University should be required to promulgate would affect only the staff and faculty of the University and not the "private rights of or procedures available to the public." We thus hold that the area of concern raised by appellant is exempted from public rule-making procedures and that appellant's claim fails on the merits. See *Ah Ho v. Cobb,* 62 Haw. 546, 617 P.2d 1208 (1980); *Holdman v. Olim,* 59 Haw. 346, 581 P.2d 1164 (1978); *Tai v. Chang,* 58 Haw. 386, 570 P.2d 563 (1977); *Doe v. Chang,* 58 Haw. 94, 564 P.2d 1271 (1977) for other cases applying the internal management exception of HAPA.

## II.

We turn now to appellant's claim against defendant-appellee Inskeep. Appellant argues that the lower court erred in concluding that no enforceable contract of bailment existed between plaintiff and Inskeep. Alternatively, he contends that even if a bailment did

---

[9] The University contends that it is exempt from HAPA because it is a body corporate different from other state agencies in that it owns land in its own name and sues and is sued in its own name. We do not express an opinion on the matter.

not exist, appellee is liable on a negligence theory. We discuss these contentions below.

## A. *Bailment.*

A bailment has been defined as the "rightful possession of goods by one who is not the owner." 9 S. Williston, *Contracts* 875 (3d ed. 1967). Bailment is normally a consensual transaction. "The bailor intentionally delivers possession of his goods to the bailee and the latter accepts the same with a real or a presumed knowledge of the responsibility entailed thereby." R. Brown, *The Law of Personal Property*, § 12.1, at 319 (3d ed. 1975). Thus, the elements of a classic bailment are the intent to create a bailment, delivery of possession of the bailed items, and acceptance of the items by the bailee.

The trial court in this case made the following finding of fact with regard to plaintiff's actions upon discovering, prior to his departure on sabbatical, that some of his personal property had been removed from his office:

9. Concurrent therewith, Plaintiff learned that some of the missing items were being used by other members of the Department; whereupon Plaintiff contacted the same and directed them to return the equipment to his office and laboratory. Plaintiff also lodged a verbal complaint with Chairman Inskeep about the incident *but did not ask nor did he receive Inskeep's consent to store or otherwise safeguard Plaintiff's personal effects.* Plaintiff, on June 17, filed a written complaint with Defendant Inskeep and University authorities, reporting the incident and asking that his office and laboratory not be further disturbed during his absence. (Emphasis added.)

On appeal, a trial court's finding of fact will not be set aside unless it is "clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52(a), H.R.C.P. As we noted earlier, a finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Kim v. State*, 62 Haw. 483, 493, 616 P.2d 1376, 1382, citing *United States v. United States Gypsum Co.*, 333 U.S. 364 at 395 (1948); *Honda v. Higa*, 52 Haw. 311, 313, 475 P.2d 708, 710 (1970); *Frey v. Goebert*, 52 Haw. 308, 310,

474 P.2d 537, 538 (1970). After carefully reviewing the evidence in this case, we are not left with the definite and firm conviction that a mistake has been committed and thus cannot say that the trial court's finding of fact is clearly erroneous.

This finding negates the essential elements of a bailment. Although appellant may have asked that his office and laboratory not be disturbed during his absence, there is no intent to create a bailment, no delivery of possession, and no acceptance of the goods by Inskeep. In some situations courts will imply the existence of a bailment even though not every element of a consensual bailment is present. Such a situation arises, for example, when a finder of lost goods takes them into possession. The law imposes an obligation upon the finder to use due care in keeping the goods and requires the finder to deliver the goods to the owner upon demand. Another such instance is where a landlord resumes possession of leased premises after a tenant has departed, and finds that the tenant has left chattels behind. However, as one commentator has noted, courts are increasingly reluctant to characterize such possession by the landlord as a bailment because of the obligations imposed upon the landlord. *Brown, supra,* § 12.1 at 320. *See, e.g., Row v. Home Savings Bank,* 306 Mass. 522, 29 N.E.2d 552 (1940) (plaintiff, former tenant, found to have no right to keep property in building; defendant, mortgagee, acted reasonably in throwing away apparently worthless property found in building); *Boston Ed. Research Co., Inc. v. American Mach. & Fdry. Co.,* 355 F. Supp. 1272 (D. Mass.), *aff'd* 488 F.2d 344 (1st Cir. 1973) (plaintiff found to have abandoned goods left in factory after plaintiff's subsidiary moved from premises; defendant not liable in negligence for destruction of goods); *Banks v. Pierpont Estates, Inc.,* 27 Misc. 2d 778, 209 N.Y.S.2d 421 (1961) (no "hostile action" by landlord in throwing out property of former tenant which had been left in unlocked closet).

In this case, appellant urges us to find the existence of a constructive or implied bailment. However, in every bailment case which we have examined, whether the bailment is actual or constructive, the element of possession is necessary. "Physical control over the property allegedly bailed and an intention to exercise that control are needed to show that one is in possession of the bailed goods." *Berglund v. Roosevelt University,* 18 Ill. App.3d 842, 844-45, 310 N.E.2d 773, 776 (1974). Thus, in order to have possession, physical

control and an intent to exercise that control must be shown. In determining whether control exists, courts consider the following:

> [T]he subject matter's amenability to control, steps taken to effect control, the existence of power over the subject matter, the existence of power to exclude others from control, and the intention with which the acts in relation to the subject matter are performed.

*Collins v. The Boeing Company,* 4 Wash. App. 705, 711, 483 P.2d 1282, 1286 (1971).

In the instant case, based upon the findings of fact by the trial court, we conclude that defendant Inskeep did not have sufficient possession of the materials and goods left in appellant's office to impose the doctrine of constructive bailments. It is apparent that Inskeep did have some measure of control over Waugh's property. However, Waugh, although absent from the University, retained possession of his goods. He retained a key to his office and laboratory; he could have, at any point, removed his property (or had someone else remove his property) without asking Inskeep. Other University personnel besides Inskeep also had access to Waugh's office and laboratory, including the visiting professor who occupied the office for six weeks and other members of the Chemistry Department faculty. Although appellant has placed emphasis upon the letter he wrote to University officials on June 17, 1969 requesting that his office and laboratory not be further disturbed during his absence, it is obvious that the letter was in the nature of a complaint and it was addressed to Richard Takasaki, Acting President of the University and not to Prof. Inskeep. Thus, that letter cannot be viewed as transferring possession of the materials to appellee Inskeep. We conclude that no constructive bailment is shown by these facts.

## B. *Negligence.*

Irrespective of bailment principles, appellant contends that Inskeep had a duty to exercise reasonable care to prevent the loss or destruction of his property. The trial court concluded that, as a matter of law, defendant owed no duty to Waugh to safeguard his personal effects. We disagree.

In considering whether a defendant owes a duty to a plaintiff, we repeat the following statement from W. Prosser, *The Law of Torts,* which we cited with approval in *Kelley v. Kokua Sales & Supply, Ltd.,* 56 Haw. 204, 207, 532 P.2d 673, 675 (1975):

> [I]t should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.

The Supreme Court of California, in determining that a psychotherapist who concludes that a patient presents a serious danger of violence to another owes a duty to the potential victim, similarly stated:

> In analyzing this issue, we bear in mind that legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.

*Tarasoff v. Regents of the University of California,* 131 Cal. Rptr. 14, 22, 551 P.2d 334, 342 (1976).

In *Kelley, supra,* we also noted that "in determining whether or not a duty is owed . . . , we must weigh the considerations of policy which favor the appellants' recovery against those which favor limiting the appellees' liability." 56 Haw. at 207, 532 P.2d at 675. Although *Kelley* presented a much different factual situation, the general principles enunciated there are applicable in any consideration of whether a particular defendant owes a duty to a particular plaintiff.

The question of whether one owes a duty to another must be decided on a case-by-case basis. However, every case is governed by the rule that all persons are required to use ordinary care to prevent the property of others from being injured as a result of their conduct. In this case, we feel that the relationship between the parties and the facts surrounding the removal of appellant's property gave rise to a duty of care. Defendant Inskeep was the chairman of the Chemistry Department and plaintiff was a member of that department. The Department chairman had the authority to assign office space and exercised that authority by reassigning plaintiff's office and laboratory. Inskeep had the authority to move, or order moved, plaintiff's materials and equipment and exercised that authority by having plaintiff's materials and equipment returned to the stock-

room, stored, or otherwise moved. Thus, under these particular facts, we find a duty of care.

The second stage of our analysis requires us to determine whether the facts presented also give rise to a breach of defendant's duty of care. The trial court concluded that plaintiff had failed to prove by a preponderance of the evidence that defendant was in any way negligent in the loss, destruction, or conversion of plaintiff's property. Although no express findings of fact were made that would support this conclusion of law, implicit in the trial court's conclusion is that defendant acted as a reasonably prudent person would have acted under the circumstances. We agree.

We do not believe that defendant was required to personally supervise stockroom personnel in packing and storing Waugh's materials. Defendant gave general instructions to the Chemistry Department stockroom supervisor indicating that anything that appeared to be Waugh's personal property should be packed, labeled, and stored until his return. The stockroom supervisor testified that she had been a medical technologist for over 18 years, had a chemistry background, and was very familiar with supply houses. The supervisor stated that she surveyed Waugh's office before beginning to pack and that she did not recall seeing anything that looked like Dr. Waugh's missing compounds in vials or ampules. She stated that she did not recall seeing ampules in a dessicator and that if she had she would have recognized them as research work. Inskeep also instructed the stockroom supervisor to have Waugh's vacuum rack dismantled, apparently to make space for Dr. Seff's research. The University glassblower was called in to dismantle the rack and pieces of the rack which appeared to be personal property were stored. Under all of these circumstances, we find that Inskeep could reasonably rely on a competent stockroom supervisor and an experienced glassblower to handle the dismantling of appellant's laboratory and vacuum rack.[10]

The trial court concluded that appellant failed to prove negli-. gence by a preponderance of the evidence. He drew this conclusion on a motion to dismiss after the close of plaintiff's case. Although not

---

[10] We also note that appellant failed to introduce any expert testimony or other evidence as to whether a higher standard of care should have been applied.

explicitly stated, the motion was in essence a motion under Rule 41(b), H.R.C.P. As we recently stated in *Kim v. State, supra:*

> Rule 41(b), H.R.C.P., indeed vests trial courts with power to weigh and evaluate the evidence without special inferences favoring plaintiff, to resolve conflicts in the evidence, to determine where the preponderance of evidence lies, and to award judgment on the merits where appropriate.

62 Haw. at 490, 616 P.2d at 1381.

Our review of the entire evidence on this issue does not leave us with the conviction that a mistake has been made; and we cannot say the conclusion representing an application of the law to the evidence presented was erroneous.

Affirmed.

*Thomas P. Gill (Gill, Park & Park,* of counsel) for plaintiff-appellant.

*Ronald Y. K. Leong (Donn G. Kessler* on the brief), Deputy Attorneys General, for defendants-appellees.