**In the Matter of the Application of BERNARD RUDOLPH BANNING** to register and confirm title to land situate in the District of Koolaupoko, City and County of Honolulu, State of Hawaii

No. 15109

(APPLICATION NO. 323)

JULY 7, 1992

LUM, C.J., HAYASHI,* WAKATSUKI, AND MOON, JJ., AND CIRCUIT JUDGE HUDDY, IN PLACE OF PADGETT, J., RECUSED

---

*Associate Justice Hayashi, who heard oral argument, retired from the court on March 29, 1992. *See* HRS § 602–10 (1985).

298

OPINION OF THE COURT BY WAKATSUKI, J.

The Trustees of Kalama Community Trust (Trustees) petitioned for title to approximately 0.251 acres of accreted land fronting their Kailua shoreline property on which the Kalama Beach Club is situated. The land court granted their petition for title to the accreted land, but reserved two easements in favor of the State of Hawaii (State) for long–term public use. On appeal, the trustees argue that the land court erred in: (1) finding that there was public use of the accreted land; (2) concluding that the accreted area was subject to two easements in favor of the State; and (3) finding that Donald and Dorothy Bremner (Bremners), who are neighboring landowners, had standing "to enforce the rights of the general public in the parcel."

I.

In 1928, the Kalama Community Trust was established to operate a beach club for the use of its members and to maintain four beach access ways[1] for the use of all residents in the Kalama Tract

---

[1] These access ways are designated as Lots 20–W, 20–P, 20–I, and 20–X on Map 4 in Land Court Application 323. All of these narrow rectangular lots, which

which is a residential development located in Kailua on the island of Oahu, Hawaii. Under this instrument, the trustees are the owners of Lot 20–A located along the edge of Kailua Bay at Pueohala in Kailua, Oahu.

Lot 20–A was originally part of Grant 1106, Apana 3 to Kokohe registered under Bernard Rudolph Banning in Land Court Application 323. In 1925, upon subdivision of the land in that grant, Lot 20–A was described and delineated on Map 4 in Land Court Application 323. Lot 20–A is a 1.364 acre rectangular portion of land adjoined lengthwise on one side by several residential lots and on the opposite side by a long, narrow beach access way designated as Lot 20–X. The front or mauka (mountainside) boundary of Lot 20–A is along North Kalaheo Avenue. The rear or makai (oceanside) boundary of Lot 20–A is described as the "high water mark," in accordance with Map 4 on file under Land Court Application 323 with the land court. Beyond this "high water mark" is the seashore which is owned by the State.

The trustees also own the narrow beach access way, Lot 20–X, subject to a private easement for access by the Kalama Tract residents. However, in 1967 the City and County of Honolulu (City) acquired a public easement for access over Lot 20–X. (As with Lot 20–A, the front or mauka (mountainside) boundary of Lot 20–X faces North Kalaheo Avenue, while its rear or makai (oceanside) boundary runs approximately along the same line as Lot 20–A.) Lengthwise, as previously described, one side of Lot 20–X is bordered by Lot 20–A. Several residential lots adjoin Lot 20–X on the opposite side.

One of those residential lots is owned by the Bremners. The Bremners' property is one lot away from the seashore. (The Bremners have been the lessees of Lot 174, Land Court Application No.

---

are situated parallel to one another, provide direct access to the beach from North Kalaheo Avenue.

323, since 1969.) The Bremners' rear gate opens onto Lot 20–X, the public access way, near the area where the makai (oceanside) border of Lot 20–A and Lot 20–X meet.

The rear or makai (oceanside) boundary of Lot 20–A has been changing over the many years since 1925 when the boundary of Lot 20–A was first delineated. During that time, approximately 0.251 acres of land have gradually accreted to Lot 20–A. This accreted land consists of areas of naupaka growth, grass, and sand.

At some point during this same period, the outgrowth from an old ironwood tree blocked passage from the rear end of the beach access way, Lot 20–X, to the beach. Previously, the City had intermittently maintained the access way by cutting vegetation and clearing the sand. Also, the City had erected a chain link fence between Lot 20–A and Lot 20–X. However, the Bremners insisted that the area on which the ironwood tree had grown belonged to the State, and to the detriment of the public, refused to allow the City workers to cut the ironwood tree near the end of the access way.[2] As a result, the ironwood tree remained untrimmed. This was one reason offered to explain why members of the public were crossing over the land that was accreting to the trustees' Lot 20–A to gain access to the beach.

In addition, facing the shoreline, a City sign designating passage as a public right–of–way was posted on the accreted land. However, the City has disclaimed any interest in the land that has accreted to Lot 20–A.

Regular use of the accreted land was not only as an access way to the beach, but also included recreational uses such as watching Fourth of July fireworks, and sunbathing, fishing, picnicking, and camping.

---

[2] The Bremners also admitted that they stored their small boat in the general area just beyond the Lot 20–X access way and the trustees' Lot 20–A.

In 1988, the trustees filed a petition with the land court to register title to this land that had accreted to Lot 20–A pursuant to HRS § 501–33.[3] HRS § 501–33 requires that:

> [a]n applicant for registration of land by accretion shall *prove by a preponderance of the evidence that the accretion is natural and permanent. "Permanent" means that the accretion has been in existence for at least twenty years.* (Emphasis added.)

The trustees joined and served all neighboring landowners. All, except for the Bremners, either filed a disclaimer or defaulted.

The Bremners and the State asserted that the accretion was not natural and permanent. Further, even if it was, they argued that the entire accreted parcel should be granted to the State for the public's use and enjoyment based on the trustees' acquiescence in the extensive and lengthy public use of the parcel.

The land court found that the accreted land was proven to be permanent and natural. It concluded that the general public had used the trustees' accreted land for recreation and access to the beach for at least twenty years with the acquiescence of the trustees, and therefore, it held that those areas were impliedly dedicated by the trustees to the general public for recreation and access. For those purposes, the land court granted two easements over the accreted land to the State in favor of the public. The two easements are described as the " 'Kaneohe side footpath' for access onto and over the sand and grass portions of the accreted parcel as shown on and determined by Bremners' Exhibit 5" and the area "onto and over the sand and grass portions of the said parcel for public beach recreation use."

---

[3] Accretion has also occurred with respect to Lot 20–X as well. The accretion to Lot 20–X is not at issue here. However, the City filed a disclaimer in the present case based on the trustees' unilateral stipulation that they would permanently respect access to the beach through Lot 20–X.

## II.

The trustees challenge the land court's findings of fact that the accreted land to Lot 20–A was "used by members of the general public on a regular and continuous basis for beach recreational purposes for at least 20 years."

The trustees primarily assert that certain witnesses were more credible or knowledgeable regarding the public use of the accreted land. Specifically, they alleged that the people whom some witnesses saw using the accreted land were actually Kalama Beach members, not members of the general public.

Findings of fact are reviewed under the clearly erroneous standard in which the reviewing court must be left with a " 'definite and firm conviction that a mistake has been committed' " in order to set aside the findings. *Waugh v. University of Hawaii*, 63 Haw. 117, 132, 621 P.2d 957, 969 (1980) (citations omitted). Upon review of the record in this case, we do not find the land court's findings to be clearly erroneous.

The trustees also argue that if there was public use, it was not continuous. However, we note that the "public use need not necessarily be constant, but merely continuous in light of the particular nature of the land." 23 AM. JUR. 2D *Dedication* § 54, at 48(1983).

## III.

"Land now above the high water mark, which has been formed by imperceptible accretion against the shore line of a grant, has become attached by the law of accretion to the land described in the grant and belongs to the littoral proprietor." *Halstead v. Gray*, 7 Haw. 587 (1889). "[T]he accretion doctrine is founded on the public policy that littoral access should be preserved where possible . . . ." *State v. Zimring*, 58 Haw. 106, 119, 566 P.2d 725, 734 (1977).

> [Other] reasons ordinarily given for th[is] general rule as
> to accretions are . . . that the loss or gain is so impercepti-

ble that it is impossible to identify and follow the soil lost or to prove where it came from, that small portions of land between upland and water should not be allowed to lie idle and ownerless, or that, since the riparian owner may lose soil by the action of the water, he should have the benefit of any land gained by the same action.

65 C.J.S. *Navigable Waters* § 82(1), at 256 (1966) (footnotes omitted).

Despite this general rule, the land court held that rights to accreted land (as it was accreting) could be acquired by adverse public use under the theory of implied dedication applied in *Gion v. City of Santa Cruz*, 2 Cal. 3d 29, 84 Cal. Rptr. 162, 465 P.2d 50 (1970).[4] We decline to adopt the theory of implied dedication as espoused in *Gion*.

"A common law dedication may be accomplished without any statement, written or spoken, for one who invites or merely permits the public to use his or her land for a long period may be held to have made an offer of implied dedication." R.A. CUNNINGHAM, *The Law of Property* 751 (1984). The rationale behind this theory is that the owner is "estopped to deny permanent public access" where he has "admitted the public to use the land over a long time." *Id.; see also* 26 C.J.S. *Dedication* § 2 (1956). There must be an offer and acceptance of dedication. *See* 26 C.J.S. *Dedication* § 34

---

[4] The trustees contend that the public could not have acquired any rights in the accreted land while it was accreting but only after the accretion was proven to be natural and permanent for twenty years. However, the legislature has indicated that adverse use can establish a claim to accreted land. In 1985, the legislature added section (e) to the adverse possession statute, HRS § 669–1, which permits "any person" not just the littoral landowner to register a claim to accreted land by proving it has been natural and permanent for twenty years. Further, this interpretation is consistent with HRS § 501–87. Under HRS § 501–87, once the title to land has been registered, no "title, right, or interest in, to, or across registered land in derogation of that of the registered owner shall be acquired by prescription or adverse possession" with one exception, which is not applicable in this case.

(1956). When there is no express offer, the offer may be implied under the circumstances and the acceptance may also be implied by the nature of the public use. *See* Annotation, *Implied Acceptance, by Public Use, of Dedication of Beach or Shoreline Adjoining Public Waters*, 24 A.L.R. 4TH 294 (1983); *see also* 26 C.J.S. *Dedication* § 37 (1956). In other words, the duration and type of public use can raise both the presumption of the owner's intent (or offer) to dedicate land to public use, as well as constitute acceptance by the public. 23 AM. JUR. 2D *Dedication* §§ 36, 55 (1983).

Courts have varied in their application of implied dedication. *See* R.A. CUNNINGHAM, *The Law of Property* 751 (1984).

> As a general rule, a presumption arising from user is not conclusive, but may be rebutted. Some cases, however, take the view that long–continued adverse user establishes a conclusive presumption of dedication especially where it has continued for the prescriptive period.

23 AM. JUR. 2D *Dedication* § 74, at 62 (1983). (Footnotes omitted.)

*Gion v. City of Santa Cruz*, 2 Cal. 3d 29, 84 Cal. Rptr. 162, 465 P.2d 50 (1970), is one such case. *Gion* involved the implied dedication to the public of California shoreline property which had been used by the public for fishing, parking, and other recreational uses since about the 1900s. The *Gion* approach has been called "controversial" as it allows adverse public use of the land for the period necessary to acquire rights by prescription to raise the *conclusive* presumption of the landowner's intent to dedicate the land to the public, where adverse use is described as use of the land " 'without asking or receiving permission to do so and without objection being made by any one.' " *Gion*, 2 Cal. 3d at ___, 84 Cal. Rptr. at 168, 465 P.2d at 56. *See* R.A. CUNNINGHAM, *The Law of Property* 752 (1984).

The *Gion* court specifically stated:

common–law dedication of property can be proved either by showing acquiescence of the owner in the use of the land under circumstances that negate the idea that the use is under a license or by establishing open and continuous use by the public for the prescriptive period.... When ... a litigant seeks to prove dedication by adverse use, the inquiry shifts from the intent and activities of the owner to those of the public.... [T]he question is whether the public has engaged in 'long continued adverse use' of the land sufficient to raise the 'conclusive and undisputable presumption of knowledge and acquiescence, while at the same time it negatives the idea of a mere license.'

*Gion*, 2 Cal. 3d at ___, 84 Cal. Rptr. at 167–68, 465 P.2d at 55–56 (citations omitted).

In *Gion*, attempts by the landowner to halt the adverse use would not be sufficient, if in fact they did not prevent it from occurring.

The *Gion* court stated that where:

[the fee] owner has not attempted to halt public use in any significant way, ... it will be held as a matter of law that he intended to dedicate the property or an easement therein to the public, and evidence that the public used the property for the prescriptive period is sufficient to establish dedication.

*Id.* at ___, 84 Cal. Rptr. at 170, 465 P.2d at 58.

In *Gion*, despite the fact that the owner occasionally posted signs designating the area as private property (although he never told anyone to leave the property), the court found that adverse public use of the beach property for the prescriptive period of five years had been established. An additional consideration in *Gion* was the city maintenance of the beach which included posting signs (warning of danger from erosion), installing an emergency

alarm system, providing trash receptacles, planting groundcover and moving boulders to prevent erosion.

However, in the companion case of *Dietz v. King*, which was consolidated with *Gion*, there was no evidence of maintenance by the city. Regardless, the court found that the public used the land "as they pleased" for the prescriptive period without heeding the claims of the owners, even though the public occasionally paid a toll to the owners for the use of the beach. *Id.* at ___, 84 Cal. Rptr. at 171, 465 P.2d at 59.

## A.

The implied dedication theory set forth in *Gion* is inconsistent with the legislative purposes expressed in HRS Chapter 520. HRS § 520–1 states:

> The purpose of this chapter is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.

HRS § 520–4 specifically provides that the owner's liability is limited, with a few exceptions, where he "either directly or indirectly invites or permits without charge any person to use such property for recreational purposes."

Further, in keeping with this intent to encourage landowners to make their property available to the public for recreational uses, the legislature specifically prohibited the general public from acquiring any rights by prescription in the property as a result of such use under HRS § 520–7. HRS § 520–7 states:

> No person shall gain any rights to any land by prescription or otherwise, as a result of any usage thereof for recreational purposes as provided in this chapter.

In *State ex rel. Haman v. Fox*, 100 Idaho 140, 594 P.2d 1093 (1979), the Idaho Supreme Court rejected *Gion*'s theory of implied dedication as inconsistent with a similar statute which encouraged landowners to make their lands available by limiting their liability to recreational users. That court stated that "[i]t seems incongruous for the legislature expressly to encourage the private owner to make his land available for public recreation and for this court to simultaneously presume that the private owner has thereby dedicated his property to the public use." *Id.* at 147, 594 P.2d at 1100.

### B.

While continuous adverse public use raises a presumption of implied dedication in Hawaii under *The King v. Cornwell*, 3 Haw. 154 (1869), it is not a conclusive presumption. Further, *Cornwell* requires adverse public use *unopposed* and acquiesced in for *a period longer than the prescriptive period* to infer public dedication. *Cornwell*, at 155, 161–62 (1869). In *Cornwell*, the court stated that:

> '[a]ll that is requisite to constitute a good dedication is, that there should be an intention and an act of dedication on the part of the owner, and an acceptance on the part of the public, as soon as these concur, dedication is complete. Ordinarily, there is no other mode of showing an acceptance by the *public* of a dedication than by its being made *use* of by them, and this *must be sufficiently long* to evince such acceptance, *depending of course upon the circumstances* . . . and *in no case, has the time been measured by that required to create a prescription.*'
>
> . . . .
>
> *If public user be the only evidence of dedication, it must continue for a much larger period;* what that period should be, has never been definitely settled here.

*Id.* at 161–62[5] (emphasis added, citation omitted). In *Cornwell*, the court, although not informed of all of the evidence, upheld the jury decision which found that there was an implied dedication to the public for the use of a road over unenclosed lands. However, the case was ultimately remanded for a new trial based on another ground of error.

The current period for prescription is now twenty years under HRS § 657–31. HRS § 657–31 states:

> [n]o person shall commence an action to recover possession of any lands, or make any entry thereon, unless within twenty years after the right to bring the action first accrued.

Here, the land court did not make a finding that the use of the accreted parcel had continued for a period longer than the prescriptive period. Rather, the land court held only that the footpath and specific areas on the accreted parcel were used "by members of the general public on a regular and continuous basis for beach recreational purposes for at least 20 years prior to the filing of . . . [the petition to register title of the accreted land] in September 1988." Thus, under *Cornwell*, the public's use of the accreted parcel was not for a sufficient length of time to establish an easement by implied dedication.

## C.

We have acknowledged in *Hawaii County v. Sotomura*, 55 Haw. 176, 517 P.2d 57 (1973), *cert. denied*, 419 U.S. 872 (1974), that public policy "favors extending to public use and ownership as much of Hawaii's shoreline as is *reasonably* possible." *Id.* at 182,

---

[5] At the time of *Cornwell*, the prescriptive period was ten years. *Cornwell* then adopted twenty years as the period of adverse public use required to establish a public dedication. 3 Haw. at 155, 162.

517 P.2d at 61–62 (emphasis added). This interest must be balanced against the littoral landowner's right to the enjoyment of his land.

Under the facts of this case, public access to the beach can be preserved without infringing on the enjoyment of the littoral landowner in his accreted land. Here, the easements which have been granted by the land court are not critical for public access to the beach. In fact, alongside the trustees' property, Lot 20–A, is a public access way, Lot 20–X, that leads to the beach.

Because the public access way on Lot 20–X is not extended to include the accreted land just beyond it, public access to the beach will not be curtailed. Approximately 100 feet away from the trustees' property is the Kalama Beach Park which provides direct access to the beach. The park is situated on approximately four acres of land and includes a parking area, a meeting facility, and restrooms. Other easements for access by Kalama Tract residents and/or the public exist nearby. Just a few blocks away from Lot 20–A on North Kalaheo Avenue, the City has acquired Lots 20–P and 20–W as public rights of way for beach access. Within those same blocks, Lot 20–I remains as an access way for Kalama Tract residents.

### D.

Assuming there had been an implied dedication under the facts of this case, nevertheless, the grant of the two easements would fail as their description is too vague.

The trustees argue that the recently adopted Torrens property registration system "demands the registration of particularly described parcels of land." They further contend that the beach is subject to constant change, and therefore, even if specific boundaries were set out and the measurements recorded, that description of the easement would not be sufficient.

Generally, "[i]n order that user by the public may create a way by dedication or prescription, the travel must be confined to a definite and specific line." 26 C.J.S. *Dedication* § 18, at 434 (1956). "No public easement can be acquired where the line of travel varies to a considerable extent . . . . Nevertheless, slight deviations in the line of travel leaving the road substantially the same may not destroy the rights of the public." *Id.* at 434–35.

Here, the easements were described as " 'the Kaneohe side footpath' . . . as shown on and determined by Bremners' Exhibit 5" and "the sand and grass portions of the said parcel for public beach recreation use."

Bremners' Exhibit 5 is an enlarged black and white aerial photograph of the area, including Lot 20–A and Lot 20–X. A clear plastic (mylar) cover has been placed over the actual photograph. Thin strips of white tape on this cover provide the rough outline of boundaries and paths. Exhibit 5 contains no map references for the boundaries. Donald Bremner admitted at trial that the boundaries were no more than approximations.

The easement consisting of the footpath can be located by white markings on the mylar cover of the exhibit. However, from an aerial perspective, it is difficult to actually see the pathway on the photograph because it is partially obscured by vegetation. As a result, we conclude that the exact measurements cannot be made from such a photograph.

The easement consisting of the sand and grass portions of the parcel are not easily designated by such measurements either. The vague description of the easement literally allows members of the public to redefine its location each time they use the land. In effect, such a description renders a majority of the land as a public easement for recreation. While the State argues that these areas are evident on the exhibit, we conclude that the photograph does not meet the requisite standard of definiteness.

## IV.

The State contends that it has an easement for public access along a shoreline trail whenever the owner fails to exercise acts of ownership over it and has acquiesced in the public's use of it for more than five years under HRS § 264–1. We disagree.

HRS § 264–1 (1985) states in part that:

> All roads, . . . *trails*, . . . in the State, *opened, laid out, or built by private parties* and dedicated or *surrendered to the public use, are* declared to be *public highways.* Dedication of public highways shall be by deed of conveyance naming the State as grantee in the case of a state highway and naming the county as grantee in the case of a county highway. The deed of conveyance shall be delivered to and accepted by the director of transportation in the case of a state highway and shall be delivered to and accepted by the legislative body of a county in the case of a county highway. *Surrender* of public highways shall be *deemed to have taken place if no act of ownership by the owner* of the road, . . . [or] *trail . . . has been exercised for five years* . . . . (Emphasis added.)

In *Levy v. Kimball*, 50 Haw. 497, 443 P.2d 142 (1968), *appeal after remand*, 51 Haw. 540, 465 P.2d 580 (1970), a seawall used by the public as a thoroughfare was considered to fit within the definition of "public highway" although it was not expressly defined as such in the Revised Laws of Hawaii 1955, § 142–1, which was the predecessor to the present HRS § 264–1.[6] However, unlike the situation here, at the time of the trip and fall on the

---

[6] Revised Laws of Hawaii 1955, Sec. 142–1 states that:

All roads, alleys, streets, ways, lanes, trails, and bridges in the Territory, opened, laid out or built by private parties and dedicated or surrendered to the public use, are declared to be public highways.

seawall in *Levy*, the State already held an easement in favor of the general public for use of the seawall as a path of travel.

Further, HRS § 264–1 applies to trails which are either "opened, laid out, or built by *private* parties." (Emphasis added.) Here, the trustees did not build or lay out a trail to the general public.

## V.

The land court concluded that the Bremners had standing "to enforce the rights of the general public in the parcel" under *Akau v. Olohana Corp.*, 65 Haw. 383, 652 P.2d 1130 (1982). We agree.

We held in *Akau* "that a member of the public has standing to sue to enforce the rights of the public even though his injury is not different in kind from the public's generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." *Id.* at 388–89, 652 P.2d at 1134. In *Akau*, the plaintiffs had standing to bring a class action suit to enforce alleged public rights of way over trails based on their contentions that they were prevented by the defendants from using the pathways which led to the beach.

Affirmed in part and reversed in part.

*Wayne Phillip Nasser (Alan B. Burdick* with him on the briefs) of Ashford & Wriston for petitioners–appellants.
*William M. Tam*, Deputy Attorney General, for appellee.
*Donald A. Bremner*, pro se, respondent–appellee.