222 P.3d 441

**MAUNALUA BAY BEACH OHANA 28, a Hawai'i non-profit corporation; Maunalua Bay Beach Ohana 29, a Hawai'i non-profit corporation; Maunalua Bay Beach Ohana 38, a Hawai'i non-profit corporation, individually and on behalf of all others similarly situated, Plaintiffs–Appellees,**

v.

**STATE of Hawai'i, Defendant–Appellant.**

**No. 28175.**

Intermediate Court of Appeals of Hawai'i.

Dec. 30, 2009.

---

Girard D. Lau, Deputy Attorney General (William J. Wynhoff, Deputy Attorney General, with him on the briefs), State of Hawai'i, for Defendant–Appellant.

Paul Alston (Laura P. Couch, with him on the briefs), (Alston Hunt Floyd & Ing), Honolulu, for Plaintiffs–Appellees.

Carl C. Christensen, on the amicus curiae brief, for Hawaii's Thousand Friends.

Robert H. Thomas (Damon Key Leong Kupchak Hastert), Honolulu, on the amicus curiae brief, for Pacific Legal Foundation Hawaii Center.

WATANABE and FOLEY, JJ.; with NAKAMURA, C.J., concurring separately and dissenting.

Opinion of the Court by WATANABE, J.

This appeal arises from an inverse-condemnation lawsuit filed by Maunalua Bay Beach Ohana 28, Maunalua Bay Beach Ohana 29, and Maunalua Bay Beach Ohana 38 [1] (collectively, Plaintiffs), on behalf of themselves and all non-governmental owners of oceanfront real property in Hawai'i on and/or after May 19, 2003 (oceanfront, littoral, or

---

1. Plaintiffs are three Hawai'i non-profit corporations that were formed by homeowners in the Portlock area of O'ahu. The oceanfront lots underlying the Portlock homes were originally owned and developed in leasehold by the Trustees of the Estate of Bernice Pauahi Bishop (Bishop Estate). The lease for each oceanfront lot described the lot by specific metes and bounds. The leases did not include a narrow strip of land between the lot and the ocean, which Bishop Estate reserved for itself (beach-reserve lot). In the late 1980's or early 1990's, Bishop Estate sold its fee interest in the oceanfront lots to the Portlock homeowners but re- served its fee interest in the beach-reserve lots. On May 6, 2005, Bishop Estate sold to Plaintiffs the beach-reserve lots that adjoined the lots of Plaintiffs' respective homeowner members. Pursuant to the deeds for the beach-reserve lots, Bishop Estate reserved access and utility easements for itself, together with the right to grant easements over the lots to government agencies and public utilities; Plaintiffs agreed to continue to allow the public to use the beach-reserve lots "for access, customary beach activities and related recreational and community purposes"; and Plaintiffs accepted numerous restrictive covenants that ran with the lots.

riparian owners), challenging the constitutionality of Act 73, 2003 Haw. Sess. Laws at 128 (Act 73). Plaintiffs alleged that Act 73:

a. Took oceanfront owners' rights to claim accreted land (other than that which restored previously eroded land and that which was the subject of registration or quiet title proceedings on May 20, 2003) and declared all such land to be "state land";

b. Took from oceanfront owners' [sic] their property rights in (1) all accreted oceanfront land which existed on May 20, 2003 and which had not previously been registered or been made the subject of then-pending registration proceedings; and (2) all future accretion which was not proven to be the restored portion of previously accreted land;

c. Damaged oceanfront owners' remaining property by depriving them of ownership of the land abutting the ocean; and

d. Damaged all accreted lands by placing them in the conservation district.

Plaintiffs sought just compensation, blight damages, a declaratory judgment that Act 73 was unenforceable under the Hawai'i State Constitution unless and until Defendant–Appellant State of Hawai'i (State) pays just compensation to Plaintiffs and the class they represented, and an injunction forbidding the State from asserting ownership or control over the affected property and from enforcing Act 73.

On September 1, 2006, the Circuit Court of the First Circuit[2] (circuit court) entered an order granting Plaintiffs' February 13, 2006 amended motion for partial summary judgment (PSJ) on Plaintiffs' claim for declaratory relief. In relevant part, the circuit court declared that

Act 73 . . . represented a sudden change in the common law and effected an uncompensated taking of, and injury to, (a) littoral owners' accreted land, and (b) littoral owners' right to ownership of future accreted land, insofar as Act 73 declared accreted land to be "public land" and prohibited littoral owners from registering ex-

isting and future accretion under [Hawaii Revised Statutes (HRS)] Chapter 501 and/or quieting title under [HRS] Chapter 669.

This interlocutory appeal by the State followed.

We vacate that part of the PSJ order which concluded that Act 73 effected an uncompensated taking of and injury to littoral owners' right to ownership of future accreted land and remand this case to the circuit court for further proceedings consistent with this opinion.

## THE LEGAL LANDSCAPE

### A. *Definitions and General Doctrines*

In his treatise on real property, Professor Powell notes:

Where title to real property describes a boundary line as a body of water, the common law has developed several different doctrines that respond to the issues raised by the moveable nature of those bodies of water. Accretion, dereliction (or reliction), erosion and avulsion are ancient common-law doctrines rooted in the Roman law of alluvion and the civil law doctrine of accession. As applied, these doctrines are as complex and muddy as the movements of the water.

The term "accretion" denotes the process by which an area of land is increased by the gradual deposit of soil due to the action of a boundary river, stream, lake, pond, or tidal waters. The term "dereliction," or its modern counterpart "reliction," denotes the process by which land is exposed by the gradual receding of a body of water. The term "erosion" denotes the process by which land is gradually covered by water. The term "avulsion" denotes the process by which there is a sudden and perceptible change in the location of a body of water.

. . . .

Where the change in location of a body of water is caused by accretion, reliction, or erosion, the boundary line between the abutting landowners moved with the wa-

---

**2.** The Honorable Eden Elizabeth Hifo presided.

terway. Thus the riparian or littoral owner is given title to lands that are gradually added by accretion or reliction. In some circumstances, whether the accretion occurs on the banks of a river or stream rather than on the banks of other bodies of water may be critical in determining the ownership of the accreted lands. Similarly, a riparian owner loses title to lands that are submerged through the process of erosion. In contrast, if the boundary river, stream, lake, or tidal water changes its location because of the process of avulsion, the boundary line remains the same. In some circumstances, the doctrine of re-emergence [3] will be applied to both accretive and avulsive changes to determine the ownership of certain lands.

Richard M. Powell, 9 *Powell on Real Property* §§ 66.01[1]–66.01[2], at 66-2–66-9 (2006) (footnote added; footnotes omitted).

Some scholars have expressed doubt that the doctrines of accretion, erosion, reliction, and avulsion are actually rules of law, causing a stated result upon the occurrence of stipulated facts, rather than rules of construction used to determine what the grantor of riparian land intended the grantee of the land to receive. *See, e.g.,* 9 *Powell on Real Property* § 66.03[1], at 66–24 (2006); Herbert Thorndike Tiffany, 4 *The Law of Real Property* § 1220 (3d ed.1975 & 2009–2010 cum. supp.). As Professor Tiffany explains,

if we recognize a distinct doctrine of accretion, in effect a rule of law that an owner of land shall have whatever adjacent land may be created by the gradual action or change of water, the intention of the parties interested in the delimitation of the boundaries of the land is immaterial. In the presence of such a doctrine, the fact that, in conveying the property to its present owner, the grantor expressly retained all future accretions, would be immaterial, as would be the fact that the conveyance, in describing the land, made no reference to the body or stream of water, or to any

incident or characteristic thereof. We do not find any case which explicitly decides that one can, in conveying property bounding on water, retain any subsequent accretions thereto, but there are dicta to that effect. The effectiveness of intention in this regard is also indicated by judicial assertions that when the boundary is fixed by the deed at a specified line without reference to the water, the grantee cannot claim accretions beyond such line.... The question whether there is a distinct doctrine of accretion, or whether the so-called doctrine is merely a rule for the ascertainment of boundaries on water, appears to be clearly presented by cases involving the right of one, whose nonriparian land has become riparian by the gradual encroachment of the water, to claim land subsequently formed by the accretion of the water. In such a case, the intention of the grantor of the present proprietor, or of some person anterior to him in the chain of title, was to convey land extending only to a boundary away from the water, and consequently if, because his land has become riparian, he is given the benefit of accretions thereto, he is in effect given what it was never the intention of his predecessor in title to convey. If there is a rule of law that accretions belong to the riparian proprietor, he is entitled to the accretions, while otherwise he is not so entitled.

4 *The Law of Real Property* § 1220, at 1075–76 (footnotes omitted).

The doctrine of accretion has been rationalized by courts and commentators on various grounds. Professor Powell summarized and critiqued these rationales as follows:

Under the Roman law of accession, the owner of the cow also owns the calf, the owner of riparian or littoral land owns the accreted land. This rationale has received little support in recent times and is clearly not relevant when either the process of reliction or erosion is occurring.

Under the general rules of erosion, A loses title to his or her parcel. Then, by the process of accretion, A's parcel re-emerges.
9 *Powell on Real Property* § 66.03[1], at 66–25–66-26.

---

**3.** The re-emergence doctrine typically applies to the following fact pattern:

A owns a riparian parcel while B owns an adjacent upland non-riparian parcel. By the process of erosion all of A's parcel becomes submerged and B's parcel becomes riparian.

A second rationale occasionally mentioned by the courts and commentators is the ancient legal maxim of *de minimis non curat lex*. There is a logical connection between the de minimis concept and the requirement for accretion, reliction, and erosion that the change be gradual and imperceptible, but the justification has received little modern support since in many accretion cases substantial and valuable acreage is involved.

Another rationale is tautological. Where the parties have designated a body of water as a boundary line, that body of water remains the boundary even if it should change its location. This justification may have been derived from the Roman law where there is no distinction made between accretive and avulsive changes. It is inconsistent, however, with the existence of the doctrine of avulsion because the agreed-to water boundary does not move if the change is determined to be sudden and perceptible.

A fourth rationale is alternatively identified as the productivity or efficiency theory. There are two subsets to this justification. The first notes the inefficiency of small slivers of land surrounded by water and unconnected by land with the owner. The second notes that the adjacent owner is in a better position to use the land than the state or the non-adjacent owner. As stated by the Supreme Court: "it is in the interest of the community, that all lands should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore."

A fifth rationale is a compensation or equity theory. The Supreme Court succinctly summarized this justification when it stated:

> Since a riparian owner is subject to losing land by erosion beyond his [or her] control, he [or she] should benefit from any additions to his [or her] lands by the accretions thereto which are equally beyond his [or her] control.

This rationale has received only modest judicial support and has been criticized as being tautological and based on erroneous assumptions.

The most persuasive and fundamental rationale for a doctrine that permits a boundary to follow the changing location of a body of water is the desirability of maintaining land as riparian that was riparian under earlier conditions, thus assuring the upland owners of access to the water along with the other advantages of such contiguity. A subset of the access to water rationale is the expectancy argument. One who purchases riparian land expects that the land will retain its riparian character even if the body of water moves. An essential attribute of a riparian or littoral parcel is its access to water, so when such a parcel was created or transferred the parties must have intended the transferee to retain that access.

9 *Powell on Real Property* § 66.01[3], at 66-9–66-13.

### B. *Hawai'i Supreme Court Precedent*

The supreme court of the Kingdom of Hawai'i first addressed the ownership of accreted lands in *Halstead v. Gay*, 7 Haw. 587 (1889), a case in which the plaintiff sought damages from the defendant for trespassing on land seaward of the boundary of the plaintiff's oceanfront property, as described in the plaintiff's deed. According to the deed, the property's seaside boundary was "ma kahakai a hiki i ka hope o ka holo mua ana," without distance given. The supreme court explained that "kaha" means "scratch, or mark," " '[k]ai means the sea, or salt water," and as described in the survey, "[k]ahakai ... means the mark of the sea, the junction or edge of the sea and land." *Id.* at 589. The supreme court translated "[a] hiki i kahakai" as "reaching to high water mark" and "ma kahakai a hiki i ka hope o ka holo mua ana" as "along the high water mark to the end of the first course," *id.*, and held, based on this description, that it was "clear" that "[t]he intention is ... to grant to the sea, and make it coterminous with it." *Id.* The supreme court then observed:

> In this kingdom the average rise and fall of the tide is two feet. Where the coast is of rock, high and low water are on the same line. Where it is of sand, the difference between high and low water is gener-

ally too little and too ill-defined and shifting to be taken into account.

Section 387 of the Code, page 92 Compiled Laws, [4] seems to imply that the proprietorship of land adjacent to the beach extended to low water mark, for it enacts that the fisheries for a mile from low water mark are the property of the owners of the lands adjacent and appurtenant, thus making the boundary between the land and the fishery to be the low water line.

But *whether some land between present high and low water has been trespassed upon is not the question in this case, but it is whether land now above high-water mark, which has been formed by imperceptible accretion against the shore line existing at the date of the survey and grant, has become attached by the law of accretion to the land described in the grant. By the definitions we have given, it follows that the plaintiff has the rights of a littoral proprietor, and that the accretion is his.*

*Id.* at 589–90 (emphasis and footnote added).

In *In re Ashford,* 50 Haw. 314, 440 P.2d 76 (1968), the petitioners sought to register title to two parcels of land on the island of Molokaʻi, which were described in the royal patents as running "ma ke kai" (along the sea). The petitioners claimed that "the phrase describes the boundaries at mean high water which is represented by the contour traced by the intersection of the shore and the horizontal plane of mean high water based on the publications of the U.S. Coast and Geodetic Survey." *Id.* at 314–15, 440 P.2d at 77. The State claimed "that 'ma ke kai' is the high water mark that is along the edge of

vegetation or the line of debris left by the wash of waves during ordinary high tide[,]" or "approximately 20 to 30 feet above the line claimed by the [petitioners]." *Id.* at 315, 440 P.2d at 77 (footnote omitted). The Hawaiʻi Supreme Court, in a 4–1 decision, held:

*We are of the opinion that 'ma ke kai' is along the upper reaches of the wash of waves, usually evidenced by the edge of vegetation or by the line of debris left by the wash of waves, and that the trial court erred in finding that it is the intersection of the shore with the horizontal plane of mean high water.*

. . . .

When the royal patents were issued in 1866 by King Kamehameha V, the sovereign, not having any knowledge of the data contained in the publications of the U.S. Coast and Geodetic Survey, did not intend to and did not grant title to the land along the ocean boundary as claimed by the [petitioners]. Hawaii's land laws are unique in that they are based on ancient tradition, custom, practice and usage. The method of locating the seaward boundaries was by reputation evidence from kamaainas [5] and by the custom and practice of the government's survey office. It is not solely a question for a modern-day surveyor to determine boundaries in a manner completely oblivious to the knowledge and intention of the king and old-time kamaainas who knew the history and names of various lands and the monuments thereof.

In this jurisdiction, it has long been the rule, based on necessity, to allow reputation evidence by kamaaina witnesses in land disputes. The rule has a historical

---

**4.** Section 387 of the Compiled Laws of the Hawaiian Kingdom provided:

The fishing grounds from the reefs, and where there happen to be no reefs, from the distance of one geographical mile seaward to the beach at low water mark, shall, in law, be considered the private property of the konohikis, whose lands, by ancient regulation, belong to the same; in the possession of which private fisheries, the said konohikis shall not be molested, except to the extent of the reservations and prohibitions hereinafter set forth.

1884 Compiled Laws of the Hawaiian Kingdom § 387, at 92–93. A "konohiki" is the "[h]eadman of an *ahupuaʻa* land division under the

chief; land or fishing rights under control of the *konohiki;* such rights are sometimes called *konohiki* rights." Mary K. Pukui and Samuel H. Elbert, *Hawaiian Dictionary* 166 (1986). An "ahupuaʻa" is a "[l]and division usually extending from the uplands to the sea, so called because the boundary was marked by a heap (*ahu*) of stones surmounted by an image of a pig (*puaʻa*), or because a pig or other tribute was laid on the alter as tax to the chief." *Id.* at 9.

**5.** A "kamaʻaina" is defined as "[n]ative-born, one born in a place, host[.]" *Hawaiian Dictionary* at 124.

basis unique to Hawaiian land law. It was the custom of the ancient Hawaiians to name each division of land and the boundaries of each division were known to the people living thereon or in the neighborhood. 'Some persons were specially taught and made repositories of this knowledge, and it was carefully delivered from father to son.' With the Great Mahele in 1848, these kamaainas, who knew and lived in the area, went on the land with the government surveyors and pointed out the boundaries to the various divisions of land. In land disputes following the Great Mahele, the early opinions of this court show that the testimony of kamaaina witnesses were permitted into evidence. In some cases, the outcome of decisions turned on such testimony.

Two kamaaina witnesses, living in the area of [petitioners'] land, testified, over [petitioners'] objections, that according to ancient tradition, custom and usage, the location of a public and private boundary dividing private land and public beaches was along the upper reaches of the waves as represented by the edge of vegetation or the line of debris. In ancient Hawaii, the line of growth of a certain kind of tree, herb or grass sometimes made up a boundary.

Cases cited from other jurisdictions cannot be used in determining the intention of the King in 1866.

*Id.* at 316–17, 440 P.2d at 77–78 (footnote added; citations and footnotes omitted).

Five years later, the Hawai'i Supreme Court further developed the rule pronounced in *Ashford* in an eminent-domain case initiated by the County of Hawai'i to acquire a park site. *County of Hawaii v. Sotomura,* 55 Haw. 176, 517 P.2d 57 (1973). In *Sotomura,* unlike in *Ashford,* the seaward boundary of the property at issue had been registered with the land court in 1962. The defendant property owners argued that "because land court proceedings are res judicata and conclusive against all persons as to the boundary determination, the certificate of registration [with the land court] shall be conclusive evidence of the location of the seaward boundary[,]" even if the seaward boundary had subsequently eroded. *Id.* at 178, 517 P.2d at 60. The supreme court disagreed with the property owners and held

that registered ocean front property is subject to the same burdens and incidents as unregistered land, including erosion. HRS § 501–81. Thus the determination of the land court that the seaward boundary of Lot 3 is to be located along the high water mark remains conclusive; however, the precise location of the high water mark on the ground is subject to change and may always be altered by erosion.

*Id.* at 181, 517 P.2d at 61. The supreme court then said:

Having concluded that the trial court properly determined that the seaward boundary had been altered by erosion and the location of the high water mark has shifted, we now hold that the new location of the seaward boundary on the ground, as a matter of law, is to be determined by our decision in *In re Application of Ashford, supra.*

The *Ashford* decision was a judicial recognition of long-standing public use of Hawaii's beaches to an easily recognizable boundary that has ripened into a customary right. Public policy, as interpreted by this court, favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible.

The trial court correctly determined that the seaward boundary lies along "the upper reaches of the wash of waves." However, the court erred in locating the boundary along the debris line, rather than along the vegetation line.

We hold as a matter of law that where the wash of the waves is marked by both a debris line and a vegetation line lying further mauka; the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of vegetation growth. The upper reaches of the wash of the waves at high tide during one season of the year may be further mauka than the upper reaches of the wash of the waves at high tide during the other seasons. Thus while the debris line may change from day to day or from season to season, the vegeta-

tion line is a more permanent monument, its growth limited by the year's highest wash of the waves.

*Id.* at 182, 517 P.2d at 61–62 (citation and footnote omitted). The supreme court then turned its attention to the question of whether title to land lost by erosion passes to the State and stated:

> In the absence of kamaaina testimony or other evidence of Hawaiian custom relevant to the question, we resort to common law principles:
>
>> The loss of lands by the permanent encroachment of the waters is one of the hazards incident to littoral or riparian ownership.... [W]hen the sea, lake or navigable stream gradually and imperceptibly encroaches upon the land, the loss falls upon the owner, and the land thus lost by erosion returns to the ownership of the state. *In re City of Buffalo,* 206 N.Y. 319, 325, 99 N.E. 850, 852 (1912).
>
> We find another line of cases persuasive to determine this question. Land below the high water mark, like flowing water, is a natural resource owned by the state, "subject to, but in some sense in trust for, the enjoyment of certain public rights." *Bishop v. Mahiko,* 35 Haw. 608, 647 (1940). The public trust doctrine, as this theory is commonly known, was adopted by this court in *King v. Oahu Railway & Land Co.,* 11 Haw. 717 (1899). In that case we adopted the reasoning of the United States Supreme Court in *Illinois Central R.R. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), holding that title to land below the high water mark was:
>
>> ... different in character from that which the state holds in lands intended for sale.... It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.... The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without

any substantial impairment of the public interest in the lands and waters remaining. *King v. Oahu Railway & Land Co.,* 11 Haw. at 723–24.

> We hold that the land below the *Ashford* seaward boundary line as to be redetermined belongs to the State of Hawaii, and the defendants should not be compensated therefor.

*Id.* at 183–84, 517 P.2d at 62–63 (brackets and ellipses in original).

In *In re Sanborn,* 57 Haw. 585, 562 P.2d 771 (1977), the appellees had sought approval from the County of Kaua'i (Kaua'i) to subdivide a beachfront lot into two smaller lots. Pursuant to the then-recently enacted state-shoreline-setback act, HRS §§ 205–31 through 205–37 (Supp.1975), the appellees were required to submit to the Kaua'i planning department a map of their property, certified partly by the state land surveyor (state surveyor). When the state surveyor refused to certify the map prepared by the appellees, they sued. *Id.* at 587, 562 P.2d at 772. The land court recognized that the vegetation and debris line drawn on a map of the appellees' property represented "the 'upper reaches of the wash of waves' during ordinary high tide during the winter season, when the ... waves are further mauka (or inland) than the highest wash of waves during the summer season." *Id.* at 588, 562 P.2d at 773. However, the land court denied legal significance to the vegetation and debris line, determining instead that the appellees' "beachfront title is fixed by certain distances and azimuths set out in the 1951 land court decree of registering title to the property." *Id.* at 589, 562 P.2d at 774. When these distances and azimuths were plotted on a map of the appellees' property, "they gave a line approximately 40 to 45 feet makai (seaward) of the 'vegetation and debris line'." *Id.,* 562 P.2d at 774. On appeal by the state surveyor, the Hawai'i Supreme Court held:

> It is undisputed that during the course of the year actual high water mark varies, with ordinary winter tides reaching substantially further mauka than ordinary summer tides, primarily due to the washing out of beach sands during the winter months. However it is also undisputed

that, because of the annual return of sands during the summer months, there has been no substantial *permanent* erosion of the [appellees'] beach since 1951.

The court below held that, because there has been no permanent erosion since 1951, the State is bound by the measurements in the 1951 decree. We reverse. We hold that, regardless of whether or not there has been permanent erosion, the [appellees'] beachfront title boundary is the upper reaches of the wash of waves. Although we find that the State is bound by the 1951 decree to the extent that the decree fixes the [appellees'] title line as being "along the high water mark at seashore", we also find that the specific distances and azimuths given for high water mark in 1951 are not conclusive, but are merely prima facie descriptions of high water mark, presumed accurate until proved otherwise. The evidence adduced at trial below established that the 1951 measurements do not reflect (and given the lack of permanent erosion, probably never reflected) the upper reaches of the wash of waves. Rather, the trial court made the finding of fact that the "vegetation and debris line" represents the upper reaches of the wash of waves. Such finding was not clearly erroneous. Accordingly, the "vegetation and debris line" represents the [appellees'] beachfront title line.

*Id.* at 589–91, 562 P.2d at 774–75. The supreme court then addressed the appellees' contention that HRS § 501–71 gave binding effect to the specific distances and azimuths set out in the 1951 decree for the line of high water. HRS § 501–71 provided then, as it does currently, in relevant part, as follows:

> Every decree of registration of absolute title shall bind the land, and quiet the title thereto, subject only to the exceptions stated in section 501–82. It shall be conclusive upon and against all persons, including the State[.]

*Id.* at 591, 562 P.2d at 775; HRS § 501–71 (2006). The supreme court stated that although the foregoing statute literally "states in general terms that a land court decree of registration shall bind the land and be conclusive[,]" "[t]he section does not say that

every aspect of a land court decree is always conclusive." *Id.,* 562 P.2d at 775. The supreme court explained that

> [t]he underlying purpose of land court registration under the Torrens system is to afford certainty of title, but it is unrealistic to afford absolute certainty. Our statute explicitly states certain exceptions to the conclusiveness of land court decrees, both in HRS § 501–82 and in HRS § 501–71.... Such stated exceptions are not necessarily the sole limitations upon a Torrens decree of registration.
>
> ....
>
> In Hawaii, the public trust doctrine, recognized in our case law prior to the enactment of our land court statute, can similarly be deemed to create an exception to our land court statute, thus invalidating any purported registration of land below high water mark. Although the instant case is decided on narrower grounds, *infra,* we approve this court's analysis in *Sotomura, supra,* 55 Haw. at 183–84, 517 P.2d at 63, where it is stated, with reference to land courted property, that land below high water mark is held in public trust by the State, whose ownership may not be relinquished, except where relinquishment is consistent with certain public purposes. Under this analysis, any purported registration below the upper reaches of the wash of waves in favor of the appellees was ineffective.
>
> ....
>
> In *McCandless v. Du Roi,* 23 Haw. 51 (1915), this court stated that land court decrees are subject to the same rules of construction generally applicable to deeds and that therefore, in construing a land court decree, " 'course and distance will yield to known visible and definite objects whether natural or artificial.' " 23 Haw. at 54.
>
> ....
>
> We follow *McCandless,* finding that in the 1951 decree the natural monument "along high water mark" controls over the specific distances and azimuths. We further find that the true line of high water in this jurisdiction is along the upper reaches of the wash of waves, as discussed in *In re*

*Application of Ashford,* and *Sotomura, supra.*

*Id.* at 591–96, 562 P.2d at 775–77 (footnotes and some citations omitted). The supreme court then turned its attention to the appellees' contention that "both the Hawaii and federal constitutions would be violated if this court fixes [their] title line along the upper reaches of the wash of waves" because "such an adjudication would be a taking of private property for public use without just compensation." *Id.,* 562 P.2d at 777–78. The supreme court held as follows:

Under our interpretation of the 1951 decree, we see no constitutional infirmity. The 1951 decree recognized that the [appellees'] title extends to a line "along high water mark". We affirm the holding in *McCandless, supra,* that distances and azimuths in a land court decree are not conclusive in fixing a title line on a body of water, where the line is also described in general terms as running along the body of water.

. . . .

The absence of a clear legal standard in 1951 tends to disprove the existence of a reasonable expectation in 1951 that the land court would be able to fix conclusively the distances and azimuths of high water. Moreover, as of 1951 the *McCandless* decision had been standing undisturbed for over 35 years. It would have been unreasonable for the parties to rely on specific distances and azimuths after *McCandless* had held that such measurements are inconclusive.

*Id.* at 597, 562 P.2d at 778.

In *State v. Zimring,* 58 Haw. 106, 566 P.2d 725 (1977), the State sought to quiet title in itself as against the Zimrings and their predecessors-in-interest to approximately 7.9 acres of new land that had been added to the Zimrings' shoreline property by the Puna volcanic eruption of 1955 (lava extension). The Zimrings' deed described the oceanfront boundary of their property as being "along high water mark[.]" *Id.* at 108, 566 P.2d at 728. The Hawai'i Supreme Court initially observed that historically, "the people of Hawaii are the original owners of all Hawaiian land." *Id.* at 111, 566 P.2d at 729. However,

bowing to pressure exerted by foreign residents who sought fee title to land, "King Kamehameha III undertook a reformation of the traditional system of land tenure by instituting a regime of private title in the 1840's" which necessarily diminished the lands in the public domain. *Id.,* 566 P.2d at 729. The supreme court stated:

This encapsulation of the original and development of the private title in Hawaii makes clear the validity of the basic proposition in Hawaiian property law that land in its original state is public land and if not awarded or granted, such land remains in the public domain. To establish legally cognizable private title to land in the great majority of cases, one must show that he or a predecessor-in-interest acquired a Land Commission Award, a Royal Patent, a Kamehameha Deed, a Grant, a Royal Patent Grant, or other government grant for the land in question. Such award for grant can be demonstrated by either the document itself or through the application of the "presumption of a lost grant."

Aside from acquisition of documented title, one can also show acquisition of private ownership through operation of common law or as established by pre–1892 Hawaiian usage pursuant to HRS § 1–1 . . . .

Therefore, we find the State's position that all land not awarded or granted remains public land to be basically correct. We would only add that transfer to private ownership can also be shown through the operation of common law or as established by pre–1892 Hawaiian usage.

*Id.* at 114–15, 566 P.2d at 731. The supreme court held that there was a paucity of evidence adduced that "Hawaii usage prior to 1892 gave to the owner of the land along the seashore, title to land created by volcanic eruption when the eruption destroyed the pre-existing seashore boundary and formed a new boundary along the sea[.]" *Id.* at 118, 566 P.2d at 733. The supreme court also disagreed with the Zimrings that "the common law on accretion and avulsion in other states is not directly on point" and held that

[a]s known at common law, "the term 'accretion' denotes the process by which the

area of owned land is increased by the gradual deposit of soil due to the action of a bounding river, stream, lake, pond, or tidal waters." 7 R. Powell, Real Property (1976) ¶ 983. When accretion is found, the owner of the contiguous land takes title to the accreted land. Professor Powell indicates that the "basic justification for a doctrine which permits a boundary to follow the changing stream bank is the desirability of keeping land riparian which was riparian under earlier facts, thus assuring the upland owners access to the water and the advantages of this contiguity." *Id.*

*While the accretion doctrine is founded on the public policy that littoral access should be preserved where possible, the law in other jurisdictions makes it clear that the preservation of littoral access is not sacrosanct and must sometimes defer to other interests and considerations. For example, it is well established in California "that accretions formed gradually and imperceptibly, but caused entirely by artificial means ... belong to the state or its grantee, and do not belong to the upland owner. In California it is also well settled that being cut off from contact with the sea is not basis for proper complaint.*

. . . .

Likewise, in cases where there have been rapid, easily perceived and sometimes violent shifts of land (avulsion) incident to floods, storms, or channel breakthroughs, preexisting legal foundations are retained notwithstanding the fact that former riparian owners may have lost their access to the water.

In determining in whom lava extensions should vest, we are guided by equitable principles and must balance between competing interests. On the one hand, there is the interest of the former littoral owner seeking to regain access to the ocean. On the other hand is the interest of the public at large, the original and ultimate owner of all Hawaiian land.

Certainly, a grant of the lava extension to the former littoral owner would compensate him [or her] for the loss of the beachfrontage character of his [or her] property. However, it is the windfall of the added acreage which such owner would also be afforded which this court finds troublesome. If a one-third acre parcel fronting the ocean is flowed over by lava which adds one or two seaward acres to the parcel, is it equitable that its owner acquire property which is three or six times the size of the preexisting parcel? If a littoral owner is to be thus compensated for lava devastation, should not an upland pasture or farm owner be also compensated with pasture or farm land for the destruction of what had been the chief economic attribute of the parcel?

It is impossible for any court to fashion a legal doctrine which will equitably compensate all victims of lava devastation. This court believes that it is within the province of the legislature to determine the nature and extent of compensation for such natural disasters.

Rather than allowing only a few of the many lava victims the windfall of lava extensions, this court believes that equity and sound public policy demand that such land inure to the benefit of all the people of Hawaii, in whose behalf the government acts as trustee. Given the paucity of land in our island state and the concentration of private ownership in relatively few citizens, a policy enriching only a few would be unwise. Thus we hold that lava extensions vest when created in the people of Hawaii, held in public trust by the government for the benefit, use and enjoyment of all the people.

Under public trust principles, the State as trustee has the duty to protect and maintain the trust property and regulate its use. Presumptively, this duty is to be implemented by devoting the land to actual public uses, *e.g.,* recreation. Sale of the property would be permissible only where the sale promotes a valid public purpose.

While the Zimrings cannot be granted the private beachfront title which they seek, they, as members of the public, would share in public access to the lava extension and to the ocean, unless the interest in allowing public access is outweighed by some other public interest, or

unless the land is sold in furtherance of the public interest.

*Id.* at 120–21, 566 P.2d at 734–35 (emphasis added; some ellipses in original; citations and footnotes omitted).

In *In re Application of Banning,* 73 Haw. 297, 832 P.2d 724 (1992), the Trustees of Kalama Community Trust (Trustees) filed a petition with the land court pursuant to HRS § 501–33 [6] to register title to approximately 0.251 acres of "accreted" land fronting their Kailua shoreline property and joined and served all neighboring landowners. A neighboring landowner and the State asserted that registration should be denied because the alleged "accretion" to the Trustees' property "was not natural and permanent." *Id.* at 302, 832 P.2d at 727. The land court found that the "accreted" land was permanent and natural but that it had been used by the general public for recreation and access to the beach for at least twenty years, with the acquiescence of the Trustees, and had therefore been impliedly dedicated to the general public. *Id.,* 832 P.2d at 727–28. On appeal, the supreme court reversed the land court's finding of implied dedication to the general public. In doing so, the supreme court initially observed:

> "Land now above the high water mark, which has been formed by imperceptible accretion against the shore line of a grant, has become attached by the law of accretion to the land described in the grant and belongs to the littoral proprietor." *Halstead v. Gray[Gay],* 7 Haw. 587 (1889). "[T]he accretion doctrine is founded on the public policy that littoral access should be preserved where possible...." *State v. Zimring,* 58 Haw. 106, 119, 566 P.2d 725, 734 (1977).

> [Other] reasons ordinarily given for th[is] general rule as to accretions are ... that the loss or gain is so imperceptible that it is impossible to identify and follow the soil lost or to prove where it came from, that small portions of land

between upland and water should not be allowed to lie idle and ownerless, or that, since the riparian owner may lose soil by the action of the water, he should have the benefit of any land gained by the same action.

65 C.J.S. *Navigable Waters* § 82(1), at 256 (1966) (footnotes omitted).

*Id.* at 303–04, 832 P.2d at 728 (brackets and ellipsis in original). The supreme court also stated:

> We have acknowledged in *Hawaii County v. Sotomura,* 55 Haw. 176, 517 P.2d 57 (1973), *cert. denied,* 419 U.S. 872[, 95 S.Ct. 132, 42 L.Ed.2d 111] (1974), that public policy "favors extending to public use and ownership as much of Hawaii's shoreline as is *reasonably* possible." *Id.* at 182, 517 P.2d at 61–62 (emphasis added). This interest must be balanced against the littoral landowner's right to the enjoyment of his land.

> Under the facts of this case, public access to the beach can be preserved without infringing on the enjoyment of the littoral landowner in his accreted land.

*Id.* at 309–10, 832 P.2d at 731.

More recently, in *Diamond v. State,* 112 Hawai'i 161, 145 P.3d 704 (2006), the supreme court was called upon to determine the proper location of the shoreline under HRS chapter 205A, the Coastal Zone Management Act (CZMA). Pursuant to HRS § 205A–1 (2001), "[s]horeline" is defined as the "upper reaches of the wash of the waves, other than storm and seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetarian growth, or the upper limit of debris left by the wash of the waves." This definition is thus equivalent to the Hawai'i Supreme Court's delineation of the boundary dividing private land from public beaches that was adopted in *Ashford.* Under the CZMA, the state board of land and natural resources (BLNR) is responsible for certifying the shoreline of an

---

6. The supreme court noted in *Banning* that HRS § 501–33 required that

[a]n applicant for registration of land by accretion shall *prove by a preponderance of the evidence that the accretion is natural and per-*

*manent. "Permanent" means that the accretion has been in existence for at least twenty years.*

*Id.,* 832 P.2d at 727 (bolded emphasis and brackets in original).

oceanfront property for building-setback purposes. HRS § 205A–42 (2001). A certified shoreline, which is valid for twelve months, HRS § 205A–42(a), is the baseline that is used to (1) measure the shoreline setback line, defined as "that line established in this part [III [7]] or by the county running inland from the shoreline at a horizontal plane," HRS § 205A–41 (2001) (footnote added); and (2) determine the "shoreline area," which encompasses "all of the land area between the shoreline and the shoreline setback line," HRS § 205A–41, where structures and certain activities are prohibited by statute. *See* HRS § 205A–44 (2001).

In *Diamond,* an oceanfront property owner hired a contractor to cut the trees on the owner's property, hired a landscaper to plant salt-tolerant vegetation in the shoreline area of the property, and installed an irrigation line to water the newly planted vegetation. *Id.* at 164, 145 P.3d at 707. In certifying the property's shoreline, the BLNR used the "stable vegetation line"—the line where plants, "without continued human intervention, are well-established and would not be uprooted, broken off, or unable to survive occasional wash or run-up of waves"—even though the vegetation had originally been induced by human hands and the debris line representing the upper wash of the waves occur[red] mauka (inward) of the vegetation line. *Id.* at 168, 145 P.3d at 711.

The Hawai'i Supreme Court held that based on the plain and obvious meaning of the statute, the statute's legislative history, and relevant case law, the shoreline should be certified at the "highest reach of the highest wash of the waves," *id.* at 172–73, 145 P.3d at 715–16, and BLNR therefore erred in certifying the shoreline based on a per se rule establishing the primacy of a vegetation line, which is a more permanent monument, over the debris line. *Id.* at 174–75, 145 P.3d at 717–18. The supreme court noted that its *Sotomura* decision "clearly favored the public policy of extending 'as much of Hawaii's shoreline as is reasonably possible' to public ownership and use" and, therefore, the vegetation line cannot trump the debris line if the

debris line is mauka of the vegetation line. *Id.* at 175, 145 P.3d at 718. The supreme court also rejected the use of artificially planted vegetation to determine the certified shoreline, stating:

> The utilization of artificially planted vegetation in determining the certified shoreline encourages private land owners to plant and promote salt-tolerant vegetation to extend their land further makai, which is contrary to the objectives and policies of HRS chapter 205A as well as the public policy we set forth in *Sotomura.* Merely because artificially planted vegetation survives more than one year does not deem it "naturally rooted and growing" such that it can be utilized to determine the shoreline. We therefore reconfirm the public policy set forth in *Sotomura* and HRS chapter 205A and reject attempts by landowners to evade this policy by artificial extensions of the vegetation lines on their properties.

*Id.* at 175–76, 145 P.3d at 718–19.

In summary, under Hawai'i Supreme Court precedent, (1) the "highest reach of the highest wash of the waves" delineates the boundary between private oceanfront property and public property for ownership purposes, as well as the baseline for measuring the shoreline setback line and determining the shoreline area, the so-called no-building zone, notwithstanding that the deed for the oceanfront property describes the property by "certain distances and azimuths" that put the seaward boundary of the property below the high-water mark, *In re Sanborn,* 57 Haw. at 589, 562 P.2d at 774; (2) land added to oceanfront property through avulsive lava extension belongs to the State; and (3) land added to oceanfront property through accretion belongs to the oceanfront property owner.

### C. The Statutory Landscape

#### 1. Act 221, 1985 Haw. Sess. Laws at 401 (Act 221)

In 1985, the Hawai'i State Legislature passed House Bill No. 194, entitled "A Bill for an Act Relating to Accretion[,]" which

---

7. HRS § 205A–43(a) (2001) provides in part that "[s]etbacks along shorelines are established of

not less than twenty feet and not more than forty feet inland from the shoreline."

was signed into law by the Governor as Act 221 on June 4, 1985. Act 221 provided, in relevant part, as follows:

SECTION 1. Chapter 183, [HRS], is amended by adding a new section to be appropriately designated and to read as follows:

"§ 183–45 **Accreted land.** No structure, retaining wall, dredging, grading, or other use which interferes or may interfere with the future natural course of the beach, including further accretion or erosion, shall be permitted to accreted land as judicially decreed under section 501–33 or 669–1(e). This provision shall not in any way be construed to affect state or county property.

Any structure or action in violation of this provision shall be immediately removed or stopped and the property owner shall be fined in accordance with section 183–41(e). Any action taken to impose or collect the penalty provided for in this subsection shall be considered a civil action."

SECTION 2. Chapter 501, [HRS], is amended by adding a new section to be designated and to read as follows:

"§ 501–33 **Accretion to land.** An applicant for registration of land by accretion shall prove by a preponderance of the evidence that the accretion is natural and permanent. "Permanent" means that the accretion has been in existence at least twenty years. The accreted portion of the land shall be considered within the conservation district unless designated otherwise by the land use commission under chapter 205. Prohibited uses are governed by section 183–45."

SECTION 3. Section 669–1, [HRS], is amended to read as follows:

"§ 669–1 **Object of action.** (a) Action may be brought by any person against another person who claims, or who may claim adversely to the plaintiff, an estate or interest in real property, for the purpose of determining the adverse claim.

(b) Action for the purpose of establishing title to a parcel of real property of five acres or less may be brought by any person who has been in adverse possession of the real property for not less than twenty years. Action for the purpose of establishing title to a parcel of real property of greater than five acres may be brought by any person who had been in adverse possession of the real property for not less than twenty years prior to November 7, 1978, or for not less than earlier applicable time periods of adverse possession. For purposes of this section, any person claiming title by adverse possession shall show that such person acted in good faith. Good faith means that, under all the facts and circumstances, a reasonable person would believe that he or she has an interest in title to the lands in question and such belief is based on inheritance, a written instrument of conveyance, or the judgment of a court of competent jurisdiction.

(c) Action brought to claim property of five acres or less on the basis of adverse possession may be asserted in good faith by any person not more than once in twenty years, after November 7, 1978.

(d) Action under subsection (a) or (b) shall be brought in the circuit court of the circuit in which the property is situated.

(e) Action may be brought by any person to quiet title to land by accretion. The person bringing the action shall prove by a preponderance of the evidence that the accretion is natural and permanent. "Permanent" means that the accretion has been in existence for at least twenty years. The accreted portion of land shall be considered within the conservation district unless designated otherwise by the land use commission under chapter 205. Prohibited uses are governed by section 183–45."

(New statutory material is underscored.)

The legislative history of Act 221 indicates that one of the primary purposes of the act was "to protect the public's access to and enjoyment of Hawaii's beaches." H. Stand. Comm. Rep. No. 346, in 1985 House Journal, at 1142; S. Stand. Comm. Rep. No. 790, in 1985 Senate Journal, at 1223; S. Stand. Comm. Rep. No. 899, in 1985 Senate Journal, at 1291. The House Committees on Water, Land Use, Development and Hawaiian Af-

fairs (WLUDHA) and Judiciary explained, in pertinent part, as follows:

> Your Committees find that a recent problem has occurred along Hawaii's shoreline in places where there are extreme shifts in sand. In such locations, landowners have constructed seawalls to protect lands created by sand movement. The construction of a seawall often causes ocean currents to move laterally along the seashore. As a result, land adjacent to the lot in which the seawall is constructed begins to erode. This prompts the owner of the eroding land to build a second seawall. This sequence repeats itself as the ocean currents move along the beach.
>
> As seawalls are constructed, two problems arise. First, a wide stretch of beach is destroyed. Only rock walls standing next to the water are left in its wake. Second, public access to the shoreline and ocean is inhibited.
>
> This bill protects the public's access to and enjoyment of Hawaii's beaches by adding a new section to Chapter 183, Hawaii Revised Statutes. The section prohibits the construction of structures or seawalls, dredging, or grading, or other use of accreted land to which title has been obtained by judicial decree after the enactment of this bill and which interferes or may interfere with the future natural course of the beach.

H. Stand. Comm. Rep. No. 346, in 1985 House Journal, at 1142–43. Similarly, the Senate Judiciary Committee stated that House Bill No. 194 "will protect public's access to beaches, as well as to provide for the minimal interference with the natural processes of beach accretion and erosion." S. Stand. Comm. Rep. No. 899, in 1985 Senate Journal, at 1291.

Another legislative purpose of Act 221 was to establish a burden of proof and provide clear standards in cases where oceanfront property owners seek to register or quiet title to accreted lands. In this regard, the

House Committees on WLUDHA and Judiciary reported:

> This bill also amends Chapter 501, [HRS], which relates to registration of land registered under the Land Court system, by adding a new section to the chapter. The section states that an application to register accreted lands may be granted only if the applicant proves by a clear [8] preponderance of the evidence that the accretion is natural and permanent. An accretion is deemed to be "permanent" if it has been in existence for more than twenty years.
>
> Similarly, this bill amends Section 669–1, [HRS], which relates to actions to quiet title, by adding a new subsection. The subsection also requires that a person bringing an action to quiet title to accreted land prove by a clear [9] preponderance of the evidence that the accretion is natural and permanent. Again, an accretion is "permanent" if it has been in existence for more than twenty years.
>
> Your Committees do not intend to affect the existing law in regard to ownership of and other rights relating to land created by accretion, and it is the intent of your Committees that the bill does not affect existing law.

H. Stand. Comm. Rep. No. 346, in 1985 House Journal, at 1142–43 (footnotes added). The Senate Judiciary Committee also explained:

> Problems have arisen along Hawaii's shoreline where the sand movement is extensive. Some beachfront owners have taken advantage of calm years when the vegetation line advances seaward to secure title to the new land. At the present time, courts have no clear standard for determining when accreted land becomes permanent and stable. This bill will remedy the problem.

S. Stand. Comm. Rep. No. 899, in 1985 Senate Journal, at 1291.

Written testimony submitted in support of House Bill No. 194 expressed the need for

---

8. The bill was subsequently amended to delete the word "clear" before the phrase "preponderance of the evidence[.]" S. Stand. Comm. Rep. No. 899, in 1985 Senate Journal, at 1292.

9. See footnote 8.

clearer standards. For example, Dr. Doak C. Cox (Dr. Cox) of the University of Hawai'i Environmental Center testified, in pertinent part:

> HB 194 pertains to the registration and land-use designation of accreted land and to measures that may affect the erosion or further accretion to such land....
>
> Before discussing details of the provisions proposed in the bill we wish to identify the problem in coastal-zone management that it is clearly intended to mitigate, and that it will indeed mitigate to a significant extent.
>
> Natural coastal accretion, and its reciprocal, erosion, are processes whose human significance is restricted in Hawaii mainly to beaches. Particularly on open coasts, beaches are geomorphologically unstable features, being subject to extension and/or retreat on time scales ranging from seconds to durations of purely geological interest. By principles of common law applicable in Hawaii, the owner of land mauka of a beach shoreline loses title to land that is lost by erosion, that is through retreat, and gains title to land that is gained by accretion, that is through extension, at least when the erosion or accretion has persisted for some time.
>
> Annual cycles are particularly marked on many Hawaiian beaches. It would be irrational to allow a land owner to claim ownership to land gained by beach extension during one season that will be lost less than a year later; and the courts generally do not apply to the annual cycles of extension and retreat the legal principles of accretion and erosion. However, many Hawaiian open coastal beaches have a history of not only annual cycles but net progressive retreat, net progressive extension, or successive periods of several decades duration during which there has been net progressive retreat and extension. It is with the implications of these longer term changes that HB 194 is concerned.

> The principal problem that would be mitigated by the provisions proposed in the bill relates to the likelihood that the owner of land to which there has been net accretion over several years may treat the accretion as if permanent, will erect structures on it that will be at risk if there is a subsequent erosion, and will then attempt to save these structures by erecting a sea wall or similar structure along the shore. Such a structure would very likely seriously decrease the chances of subsequent accretion even during a period when such accretion would occur naturally.
>
> The bill would require "proof by clear [10] preponderance of the evidence" that the accretion "has been in existence for at least twenty years" as a condition to the registration of the accreted land by the Land Court.
>
> There are beaches in Hawaii on which net accretion over a period of as long as 20 years has been followed by net erosion over a period of similar duration. Nevertheless, the proposed 20–year criterion for registration is reasonable considering the provision of the bill that would place the accreted land in the Conservation District and the provision prohibiting measures that would affect the natural processes which might result in subsequent erosion or future further accretion.

Statement by Dr. Cox on House Bill No. 194, Relating to Accretion for House Committees on WLUDHA and Judiciary, February 8, 1985 (footnote added).

*2. Act 73*

In 2003, the Hawai'i State Legislature passed House Bill No. 192, which was signed into law as Act 73 [11] on May 20, 2003, the

---

**10.** As noted earlier, the word "clear" was subsequently deleted from the bill that was enacted as Act 221.

**11.** Act 73 states, in relevant part:

> SECTION 1. Section 171–1, [HRS], is amended by adding a new definition to be appropriately inserted and to read as follows:
> " "Accreted lands" means lands formed by the gradual accumulation of land on a beach or shore along the ocean by the action of natural forces."
> SECTION 2. Section 171–2, [HRS], is amended to read as follows:
> "§ 171–2 Definition of public lands. "Public lands" means all lands or interest therein in the State classed as government or crown lands previous to August 15, 1895, or acquired or reserved by the government upon

date Act 73 became effective. Act 73 amended HRS §§ 501-33 and 669-1(e) to provide that owners of oceanfront lands could no longer register or quiet title to accreted lands unless the accretion restored previously eroded land. Act 73 also amended HRS §§ 171-2, 501-33, and 669-1 to provide that, henceforth, accreted lands not otherwise awarded shall be considered "[p]ublic lands" or "state land."

The conference committee considering House Bill No. 192 indicated that

[t]he purpose of this bill is to protect public beach land by:

> or subsequent to that date by purchase, exchange, escheat, or the exercise of the right of eminent domain, or in any other manner; including accreted lands not otherwise awarded, submerged lands, and lands beneath tidal waters which are suitable for reclamation, together with reclaimed lands which have been given the status of public lands under this chapter, except...."
>
> SECTION 3. Section 343-3, [HRS], is amended by amending subsection (c) to read as follows:
>
> "(c) The office [of environmental quality control] shall inform the public of:
>
> ....
>
> (4) An application for the registration of land by accretion pursuant to section 501-33 or 669-1(e) for any land accreted along the ocean."
>
> SECTION 4. Section 501-33, [HRS], is amended to read as follows:
>
> "§ 501-33 Accretion to land. An applicant for registration of land by accretion shall prove by a preponderance of the evidence that the accretion is natural and permanent[.]; provided that no applicant other than the State shall register land accreted along the ocean, except that a private property owner whose eroded land has been restored by accretion may file an accretion claim to regain title to the restored portion. The applicant shall supply the office of environmental quality control with notice of the application, for publication in the office's periodic bulletin in compliance with section 343-3(c)(4). The application shall not be approved unless the office of environmental quality control has published notice in the office's periodic bulletin.
>
> [ "Permanent" ] As used in this section, "permanent" means that the accretion has been in existence for at least twenty years. The accreted portion of the land shall be state land except as otherwise provided in this section and shall be considered within the conservation district [unless designated otherwise by the land use commission under chapter 205]. Prohibited uses are governed by section 183-45."

(1) Including accreted lands, that is lands formed by the gradual accumulation of land on a beach or shore along the ocean by the action of nature forces, in the definition of state public lands;

(2) Providing that no applicant other than the State shall register accreted lands, with the exception of certain private property owners;

(3) Allowing a private property owner to file an accretion claim to regain title to and register the owner's eroded land that has been restored by accretion; and

> SECTION 5. Section 669-1, [HRS], is amended by amending subsection (e) to read as follows:
>
> "(e) Action may be brought by any person to quiet title to land by accretion[.]; provided that no action shall be brought by any person other than the State to quiet title to land accreted along the ocean, except that a private property owner whose eroded land has been restored by accretion may also bring such an action for the restored portion. The person bringing the action shall prove by a preponderance of the evidence that the accretion is natural and permanent. The person bringing the action shall supply the office of environmental quality control with notice of the action for publication in the office's periodic bulletin in compliance with section 343-3(c)(4). The quiet title action shall not be decided by the court unless the office of environmental quality control has properly published notice of the action in the office's periodic bulletin.
>
> [ "Permanent" ] As used in this section, "permanent" means that the accretion has been in existence for at least twenty years. The accreted portion of land shall be state land except as otherwise provided in this section and shall be considered within the conservation district [unless designated otherwise by the land use commission under chapter 205]. Prohibited uses are governed by section 183-45."
>
> SECTION 6. Applications for the registration of land by accretion and actions to quiet title to land by accretion pending at the time of the effective date of this Act shall be processed under the law existing at the time the applications and actions were filed with the court. Applications for the registration of land by accretion and actions to quiet title to land by accretion filed subsequent to the effective date of this Act shall be processed in accordance with this Act.
>
> SECTION 7. Statutory material to be repealed is bracketed and stricken. New statutory material is underscored.

2003 Haw. Sess. Laws Act 73, at 128-30.

(4) Requiring the agency receiving the accretion application to supply the Office of Environmental Quality Control (OEQC) with a notice for publication in the OEQC's periodic bulletin.

Conf. Comm. Rep. No. 2, in 2003 House Journal, at 1700, 2003 Senate Journal, at 945. The Senate Committee on Judiciary and Hawaiian Affairs found that

> this measure will stop the unlawful taking of public beach land under the guise of fulfilling a nonexistent littoral right supposedly belonging to shorefront property owners. The measure will help Hawaii's public lands and fragile beaches by ensuring that coastal property owners do not inappropriately claim newly deposited lands makai of their property as their own.

S. Stand. Comm. Rep. No. 1224, in 2003 Senate Journal, at 1546. The House Committee on Judiciary similarly found "it crucial to protect public beaches from being transformed into private lands through the filing of accretion claims, except to restore to private ownership portions of private land removed by erosion." H. Stand. Comm. Rep. No. 626, in 2003 House Journal, at 1360.

### PROCEDURAL HISTORY OF THE UNDERLYING LAWSUIT

On May 19, 2005, one day shy of two years from the date of Act 73's enactment,[12] Plaintiffs filed the underlying complaint in the circuit court.

On December 30, 2005, the circuit court, over the State's objection, entered an order granting Plaintiffs' October 28, 2005 Amended Motion for Class Certification and certified a class of plaintiffs consisting of "[a]ll non-governmental owners of oceanfront real property in the State of Hawai'i on and/or after May 19, 2003" (Class Certification Order) This order was not certified as final for appeal purposes and is therefore not before us.

On February 13, 2006, Plaintiffs filed an amended motion for PSJ "on their claim for Injunctive Relief, barring enforcement of

[Act 73] unless and until the State of Hawai'i acknowledges that it must provide just compensation to the class members and undertakes to do so in conjunction with these proceedings." Plaintiffs claimed that they were "entitled to [PSJ] in their favor ... because there is no dispute that Act 73 is a taking of private property and no dispute that the State is refusing to pay for such taking. Injunctive Relief is necessary to enjoin the State's unlawful exercise of ownership over private real property rights it refuses to pay for." Plaintiffs argued that their motion should be granted because (1) "[i]t is undisputed that Plaintiffs owned property rights to accretion that the State wrongfully appropriated by its enactment of Act 73;" (2) "[i]t is undisputed that the State has refused to pay for Plaintiffs' accreted property rights;" and (3) "Plaintiffs are entitled to injunctive relief as a matter of law because Plaintiffs must be protected against the State's unconstitutional actions." Plaintiffs argued that

> [o]rdinarily, the remedy for an unconstitutional taking of real property is payment of just compensation via an inverse condemnation proceeding. Here, however, the situation is different. Because the legislative scheme did not intend or provide for damages, this Court is able to grant the unique remedy of precluding enforcement of Act 73. Where a legislative act takes a property right without providing for payment of just compensation, injunctive relief is appropriate.

On September 1, 2006, the circuit court entered an order granting Plaintiffs' amended motion for PSJ "insofar as Plaintiffs sought declaratory relief." No injunctive relief was granted. In its order, the circuit court held, in relevant part, as follows:

> Having considered the memoranda filed by the parties, the arguments of counsel, and the records and files in this action, the Court finds that there are no disputed issues of material fact and that [P]laintiffs are entitled to partial summary judgment as a matter of law as follows:

---

12. Pursuant to HRS § 661-5 (1993), "[e]very claim against the State, cognizable under this chapter, shall be forever barred unless the action is commenced within two years after the claim first accrues[.]"

(1) [Act 73] represented a sudden change in the common law and effected an uncompensated taking of, and injury to, (a) littoral owners' accreted land, and (b) littoral owners' right to ownership of future accreted land, insofar as Act 73 declared accreted land to be "public land" and prohibited littoral owners from registering existing and future accretion under [HRS] Chapter 501 and/or quieting title under [HRS] Chapter 669.

(2) [Act 221] was not intended to alter, and did not alter, the common law of Hawai'i with respect to the ownership of accreted land by the littoral owner. Such land belongs to the littoral landowner, whether or not title thereto is registered under [HRS] Chapter 501 or quieted under [HRS] Chapter 669, and it was not taken by the State from littoral landowners so long as the littoral landowners remained free to register title thereto accretion [sic] under [HRS] Chapter 501 or quiet title thereto under [HRS] Stat. Chapter 669.

(3) Land which accreted naturally and imperceptibly before Act 221 was not made "public land," and was not taken from littoral landowners by the State so long as littoral landowners remain free to register title to the accreted land under [HRS] Chapter 501 and/or quiet title under [HRS] Chapter 669;

(4) Land which accreted naturally and imperceptibly after Act 221 is not public land and was not and was not [sic] taken by the State from littoral landowners by Act 73, even if the land is not "permanent" within the meaning of Act 221, so long as littoral landowners remains [sic] free to register title to "permanent" accreted land under [HRS] Chapter 501 and/or quiet title under [HRS] Chapter 669.

Accordingly, for good cause it is ORDERED that the Amended Motion for Summary Judgment is GRANTED insofar as Plaintiffs sought declaratory relief.

On September 12, 2006, the parties filed their Stipulation for Leave to File Interlocutory Appeal and Order.

On September 27, 2006, the State filed its Notice of Appeal.

## DISCUSSION

The dispositive issue in this case is whether the circuit court correctly held that Act 73 "effected an uncompensated taking of, and injury to, (a) littoral owners' accreted land, and (b) littoral owners' right to ownership of future accreted land, insofar as Act 73 declared accreted land to be 'public land' and prohibited littoral owners from registering existing and future accretion under [HRS] Chapter 501 and/or quieting title under [HRS] Chapter 669."

A. *Whether Plaintiffs Have Vested Property Rights in Future Accretions*

The circuit court concluded that Act 73 "represented a sudden change in the common law and effected an uncompensated taking of littoral owners' right to ownership of future accreted land, insofar as Act 73 declared accreted land to be 'public land' and prohibited littoral owners from registering ... future accretion under [HRS] Chapter 501 and/or quieting title under [HRS] Chapter 669."

 It is true that under Hawai'i common law, land accreted to oceanfront property belongs to the oceanfront property owner, and under Act 73, all accreted lands (except those which restored eroded lands or were the subject of proceedings pending at the time Act 73 was enacted) now belong to the State. However, pursuant to HRS § 1–1 (1993):

**Common law of the State; exceptions.** The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, *except as otherwise expressly provided* by the Constitution or laws of the United States, or *by the laws of the State*, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage[.]

(Emphases added.) Furthermore, the Hawai'i Supreme Court has held that "our state

legislature may, by legislative act, change or entirely abrogate common law rules through its exercise of the legislative power under the Hawaii State Constitution, but in the exercise of such power, the legislature may not violate a constitutional provision." *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973).

In their underlying complaint, Plaintiffs claimed that Act 73 took their right to future accretions and thereby violated article I, section 20 of the Hawai'i State Constitution, which states: "Private property shall not be taken or damaged for public use without just compensation." However, any claims that Plaintiffs may have to future accretions are purely speculative, and other courts have held that a riparian owner has no vested right to future accretions.

In *Western Pac. Ry. Co. v. Southern Pac. Co.*, 151 F. 376 (9th Cir.1907), for example, the Ninth Circuit Court of Appeals, in rejecting dictum in *County of St. Clair v. Lovingston*, 23 Wall. 46, 90 U.S. 46, 68, 23 L.Ed. 59 (1874), that "[t]he riparian right to future alluvion is a vested right[,]" held: "We cannot think that the court meant to announce the doctrine that the right to alluvion becomes a vested right before such alluvion actually exists." *Western Pac. Ry. Co.*, 151 F. at 399. After distinguishing vested, expectant, and contingent rights, the court concluded: "Within that definition of vested rights, there can be no question, we think, that the right to future possible accretion could be divested by legislative action." *Id.* *See also Cohen v. United States*, 162 F. 364, 370 (C.C.N.D.Cal.1908) ("The riparian owner has no vested right in future accretions. The riparian owner cannot have a present vested right to that which does not exist, and which may never have an existence.") (citations omitted); *Latourette v. United States*, 150 F.Supp. 123, 126 (D.Ore.1957) (The "plaintiff had no vested right in the continuance of future accretions to his property by way of sands carried by the winds and in turn washed by the sea upon his lands.").

In a somewhat similar situation, the Hawai'i Supreme Court held that it was not unconstitutional to terminate, by legislation, a statute that granted exclusive fishing rights in offshore fisheries to certain tenants of an ahupua'a. *Damon v. Tsutsui*, 31 Haw. 678, 693 (1930). The supreme court explained that as to these tenants, the repealed statute "amounted to nothing more than an offer to give them certain fishing rights when they should become tenants,-an offer which was withdrawn before they were in a position to accept it." *Id.* at 693. Additionally, the supreme court said:

> When the repealing statute went into effect there had been no identification of the tenant or of the land or of the fishery. Under these circumstances it cannot properly be said that there had been any vesting. "Rights are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. On the other hand, a mere expectancy of future benefit, or a contingent interest in property founded on anticipated continuance of existing laws, does not constitute a vested right." 12 C.J. 955. "A mere expectancy of the future benefit, or a contingent interest in property founded upon anticipated continuance of existing laws, is not a vested right, and such right may be enlarged or abridged or entirely taken away by legislative enactment." 6 A. & E. Ency. L. 957. "Rights are vested, in contradiction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant, when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent, when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting." Cooley, Principles of Constitutional Law, 332, quoted with approval in *Pearsall v. Great Northern Railway*, 161 U.S. 646, 673, 16 S.Ct. 705, 40 L.Ed. 838.

*Id.* at 693–94.

It is instructive that article XI, section 1 of the Hawai'i State Constitution, which was adopted in 1978, twenty-five years before the passage of Act 73, mandates that

[f]or the benefit of present and future generations, *the State* and its political subdivisions *shall conserve and protect Hawai'i's natural beauty and all natural resources, including land, water,* air, minerals and energy sources, *and shall promote the development and utilization of these resources in a manner consistent with their conservation* and in furtherance of the self-sufficiency of the State.

*All public natural resources are held in trust by the State for the benefit of the people.*

(Emphases added.) The Hawai'i Supreme Court has stated that the foregoing provision adopts "the public trust doctrine as a fundamental principle of constitutional law in Hawai'i," *In re Water Use Permit Applications,* 94 Hawai'i 97, 132, 9 P.3d 409, 444 (2000), and that "[t]he public trust is a dual concept of sovereign right and responsibility." *Id.* at 135, 9 P.3d at 447. The foregoing constitutional provision clearly diminishes any expectation that oceanfront owners in Hawai'i had and may have in future accretions to their property.

Here, Plaintiffs have no vested right to future accretions that may never materialize and, therefore, Act 73 did not effectuate a taking of future accretions without just compensation.

B. *Whether Act 73 Effectuated an Uncompensated Taking of Littoral Owners' Existing Accreted Lands*

*1.*

■ On appeal, the State classifies accreted lands into three categories: (1) Class I accreted lands—those lands that accreted before the effective date of Act 221, i.e., before June 4, 1985; (2) Class II accreted lands—those lands that accreted after the effective date of Act 221 but before the effective date of Act 73, i.e., between June 4, 1985 and May 19, 2003; and (3) Class III accreted lands—those lands that accreted on or after the effective date of Act 73, i.e., on or after May 20, 2003.

The State then argues that (1) "Act 221 was prospective and did *not* affect Class I accreted lands" but "essentially prohibited littoral landowners from claiming any inter-

est in Class II accreted lands unless and until they became permanent, i.e., until they stayed in existence for 20 years"; (2) before any Class II accreted land could become permanent, Act 73 was enacted, "which denied non-State oceanfront landowners ownership of accreted lands (except to the extent the accretion restored previously eroded land) and made it all State land"; (3) neither Act 221 nor Act 73 affected littoral owners' interest in Class I accretions and, therefore, no taking of Class I accretions has occurred; (4) because Class II accretions, by definition, did not form until June 4, 1985, none of these accretions could have been in existence for twenty years at the time Act 73 became effective and, therefore, littoral owners had no vested property right in the Class II accretions that could be taken away by Act 73; they just had a hope that sometime in the future they might be able to assert control and dominion over Class II accretions; and (5) Act 73 did not effect a taking of Class III accretions, as those accretions did not physically exist at the time Act 73 became effective.

Contrary to the State's argument, however, Act 221, on its face, did not affect the common-law rights of a littoral owner to accreted lands. Indeed, the legislative history of Act 221 expressly mentions that the legislature did "not intend to affect the existing law in regard to ownership of and other rights relating to land created by accretion[.]" H. Stand. Comm. Rep. No. 346, in 1985 House Journal at 1142–43. As discussed above, Act 221 merely established a burden of proof and clear standards for registering or quieting title to accreted lands. More specifically, Act 221 provided that in order to register or quiet title to accreted lands, a littoral owner was required to prove, by a preponderance of the evidence, that the accretion was natural and permanent (i.e., in existence for twenty years). Act 221 did not change the supreme court's precedent that accreted land above the high-water mark belongs to the littoral owner of the land to which the accretion attached. Act 221 also did not provide that all accreted land above the high-water mark was public or state land

until the littoral owner proves that the accretion was natural and permanent.

The State is also mistaken that littoral owners had no ownership interest in Class II accretions at the time Act 73 was enacted. As discussed above, at the time Act 73 was enacted, it was Hawai'i common law that shoreline property from the sea to the high-water mark was owned by the State, and any oceanfront accretions above the high-water mark belonged to the adjoining property owner, irrespective of whether a metes-and-bounds description of the accreted lands was included in the deed of the oceanfront property owner. Act 73 clearly changed the common law by declaring that all accreted lands "not otherwise awarded" and not previously recorded or the subject of a then-pending registration or quiet-title proceeding was now state or public property. Therefore, littoral owners who had such accreted lands when Act 73 became effective on May 20, 2003 had their ownership rights in their accreted lands taken from them by the passage of Act 73. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

In *Loretto*, the United States Supreme Court held:

[W]hen the character of the governmental action is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner.

The historical rule that a permanent physical occupation of another's property is a taking has more than tradition to commend it. Such an appropriation is perhaps the most serious form of invasion of an owner's property interests. To borrow a metaphor, the government does not simply take a single "strand" from the "bundle" of property rights: it chops through the bundle, taking a slice of every strand.

Property rights in a physical thing have been described as the rights "to possess, use and dispose of it." To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights. First, the owner has no right to possess the occupied space himself [or herself], and also has no power to exclude the occupier from possession and use of the space. The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights. Second, the permanent physical occupation of property forever denies the owner any power to control the use of the property; he [or she] not only cannot exclude others, but can make no nonpossessory use of the property. Although deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, it is clearly relevant.

*Id.* at 435–36, 102 S.Ct. 3164 (citations, internal quotation marks, and footnotes omitted). Act 73 permanently divested a littoral owner of his or her ownership rights to any existing accretions to oceanfront property that were unregistered or unrecorded as of the effective date of Act 73 or for which no application for registration or petition to quiet title was pending and, therefore, Act 73 effectuated a taking of such accretions.

### 2.

The parties do not dispute that there was a legitimate public purpose for the passage of Act 73. Since the parties stipulated to an appeal of the circuit court's declaratory judgment, the circuit court did not decide Plaintiffs' claim that Plaintiffs and the class they represent were entitled to damages for the taking of their property. On remand, the circuit court must do so.

As mentioned earlier, the circuit court's Class Certification Order was not certified as a final judgment for appeal purposes and is not before us. While certification of a class for purposes of determining generically whether Act 73 effectuated a taking of littoral owners' future accretions might have been appropriate, we have questions about whether the class certification was proper for determining whether Act 73 effectuated a taking of those accretions existing as of the effective date of Act 73, since each littoral owner's factual situation regarding existing

accretions would be different and not conducive to class adjudication.

Moreover, the United States Supreme Court has held that a court should not decide an inverse-condemnation claim where a party does not identify specific property that has allegedly been taken by the government. In *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the plaintiff challenged the constitutionality of the Surface Mining Control and Reclamation Act of 1977, a federal act that placed restrictions and conditions on mining operations. The district court found these restrictions and conditions to be unconstitutional takings. *Id.* at 294, 101 S.Ct. 2352. On appeal, the Supreme Court held that

> the [d]istrict [c]ourt's ruling on the "taking" issue suffers from a fatal deficiency: neither appellees nor the court identified any property in which [appellees] have an interest that has allegedly been taken by operation of the Act. By proceeding in this fashion, the court below ignored this Court's oft-repeated admonition that the constitutionality of statutes ought not to be decided except in an actual factual setting that makes such a decision necessary. Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property. Just last Term, we reaffirmed that
>
> > "this Court has generally 'been unable to develop' any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' Rather, it has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance."
>
> These "ad hoc, factual inquiries" must be conducted with respect to specific property, and the particular estimates of econom-

ic impact and ultimate valuation relevant in the unique circumstances.

> Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the "mere enactment" of the Surface Mining Act constitutes a taking. The test to be applied in considering this facial challenge is fairly straightforward. A statute regulating the uses that can be made of property effects a taking if it "denies an owner economically viable use of his land[.]"

*Id.* at 294–95, 101 S.Ct. 2352.

The Supreme Court further stated in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), that "we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances in that case." (Citations, internal quotation marks, and brackets omitted.) The *Penn Central* Court identified "several factors that have particular significance" in "engaging in these essentially ad hoc, factual inquiries[.]" *Id.* According to the Supreme Court,

> [t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (citations omitted.)

Notably absent from Plaintiffs' complaint is any allegation that Plaintiffs have ownership rights in accreted lands that existed at the time Act 73 was enacted. Moreover, the deeds by which Plaintiffs acquired the beach-

reserve lots suggest that there were seawalls built on the lots, raising questions concerning the existence of any accretions. Because Plaintiffs have not alleged specific accretions which the State has taken from them by the enactment of Act 73 and, more damagingly, have not alleged that any accreted land even exists, the circuit court, on remand, must determine whether Plaintiffs have been injured by the enactment of Act 73.

## CONCLUSION

We conclude that (1) Plaintiffs and the class they represented had no vested property rights to future accretions to their oceanfront land and, therefore, Act 73 did not effect an uncompensated taking of future accretions; and (2) Act 73 effectuated a permanent taking of littoral owners' ownership rights to existing accretions to the owners' oceanfront properties that had not been registered or recorded or made the subject of a then-pending quiet-title lawsuit or petition to register the accretions.

Accordingly, we vacate that part of the PSJ order which concluded that Act 73 took from oceanfront owners their property rights in all future accretion that was not proven to be the restored portion of previously eroded land. We remand this case to the circuit court for a determination of whether Plaintiffs have accreted lands that existed when Act 73 was enacted and, if so, for a determination of the damages they incurred as a result of the enactment of Act 73.

### CONCURRING AND DISSENTING OPINION BY NAKAMURA, C.J.

I concur in the analysis and result reached by the majority on the issues of whether Act 73, 2003 Haw. Sess. Laws at 128–30 (Act 73), effected an uncompensated taking with respect to future accretions and existing accretions to private oceanfront property. However, the circuit court's Class Certification Order was not appealed, and the appropriate remedy for any uncompensated taking effected by Act 73 was not an issue before this court. I would not address and do not express any view on matters that were not before us. To that extent, I respectfully dissent from the majority's opinion.